**Thomas V. McLAUGHLIN; Joseph Gall; Macgall, Inc.; and Macgall Associates Limited Partnership, Plaintiffs–Appellants,**

**v.**

**Arthur ANDERSON; Capital Housing Financing Corporation, Inc.; Imagineers, Inc.; David Harrity; and Handler and Friar Architects, Inc., also known as Handler Associates Architects, Defendants–Appellees.**

**No. 557, Docket 91–6184.**

United States Court of Appeals, Second Circuit.

Argued Nov. 26, 1991.

Decided April 21, 1992.

Terrance G. Reed (Samuel J. Buffone, Asbill, Junkin, Myers & Buffone Chartered, Washington, D.C.), for plaintiffs-appellants.

David E. Rosengren, Pepe & Hazard, Hartford, Conn., for defendants-appellees, Arthur Anderson, Capital Housing Financing Corporation, Inc., and Imagineers, Inc.

Carl J. Schuman, Asst. U.S. Atty., for the D. of Conn., Hartford, Conn. (Albert S. Dabrowski, U.S. Atty., for the D. Conn., New Haven, Conn.), for defendant-appellee David B. Harrity.

Richard S. Order (Bruce W. Raphael, Updike, Kelly & Spellacy P.C., Hartford, Conn.), for defendant-appellee Handler & Friar Architects, Inc., a/k/a Handler Associates Architects.

Before: OAKES, Chief Judge, WALKER, Circuit Judge, and PARKER, District Judge.*

---

* The Honorable Fred I. Parker, Chief Judge of the United States District Court for the District of Vermont, sitting by designation.

WALKER, Circuit Judge:

This case draws us once again into the thicket created by civil actions under the Racketeer Influence and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* (RICO). The plaintiffs, Thomas McLaughlin, Joseph Gall, Macgall, Inc., and Macgall Associates Limited Partnership (collectively Macgall), filed a complaint alleging that the defendants committed and conspired to commit a series of mail frauds and extortions in violation of RICO § 1962(c) and (d). The district court dismissed the complaint on the ground that Macgall had failed to allege a pattern of racketeering activity. We now affirm, though for somewhat different reasons than those advanced by the district court. In analyzing the issues on this motion to dismiss, we must take as true the facts as alleged in the complaint and as supplemented by the RICO case statement ordered by the district court.

*Background*

This case arose out of plaintiffs' efforts to acquire a Department of Housing and Urban Development (HUD) project to rehabilitate thirty-two buildings for low-income housing in Hartford, Connecticut. Plaintiffs successfully bid for the project on March 19, 1986 and acquired title on May 8, 1986. The defendants are Capital Housing Financing Corporation (CHFC), which financed the purchase and rehabilitation of the project; Imagineers, Inc., which administered the project for CHFC; Arthur Anderson (no relation to the accounting firm), an officer or agent of CHFC and Imagineers who oversaw the bidding for and management of the project; David Harrity, who worked for HUD's Hartford office; and Handler & Friar Architects, Inc., which prepared specifications for the required renovations.

Plaintiffs allege that after they had successfully bid for the project, defendants engaged in a course of fraud and extortion in an effort to force plaintiffs to surrender the project or turn over an interest in it to the second highest bidder, Harold Rothstein. In some tension with this allegation, plaintiffs also allege that defendants conspired with HUD to induce plaintiffs to bid on the project in the first instance.

Macgall alleges that the scheme began in January of 1986, when HUD mailed a Prospectus and Invitation to Bid to Macgall. That bid document stated the terms of the offering and instructed interested parties to deal with Anderson in arranging financing for acquisition and completion of the project. Macgall then contacted Anderson, and Anderson allegedly made numerous representations about the availability of highly favorable financing terms. In reliance on these terms, Macgall bid $863,200 for the project. On March 19, 1986, HUD determined that Macgall was the highest bidder. The next highest bidder, Harold Rothstein, bid only $350,000.

After being declared the high bidder, Macgall deposited $86,320 with HUD and began negotiating with Anderson for financing so that the deal could close, as required, within thirty days of the bid. Up to this point, plaintiffs allege that Anderson was attempting to induce them to acquire the project. At a meeting on March 21, however, Anderson indicated his displeasure with Macgall's high bid. Indeed, Macgall alleges that at this meeting Anderson threatened that "I can bury you. Do you know how easy it would be for Susan [Anderson's associate] to misplace your monthly requisitions? She might place them in her second or third drawer and it would take several months to find them and by that time your sub[contractor]s will be up in an armed insurrection." Following this threat, Anderson allegedly urged Macgall to enter into a joint venture with Harold Rothstein.

Pursuant to this request, Macgall met with Rothstein to discuss the prospect of a joint venture. Finding Rothstein's terms unreasonable, the plaintiffs decided to retain sole ownership of the project.

Plaintiffs next allege that Anderson decided to punish them for rejecting Rothstein. This punishment was designed either to force plaintiffs to default on their bid, allowing Rothstein to take over the project, or to cause plaintiffs such financial difficulties as to preclude them from com-

peting with Rothstein for any future projects.

Plaintiffs allege a series of acts in furtherance of this purpose. These ranged from attempting to get Macgall's project manager disqualified, to reneging on various financing terms, to attempting to prevent Macgall from beginning work on the project. According to plaintiffs, these efforts prevented Macgall from closing on the project within thirty days of the bid, costing Macgall $22,000 in penalties, and greatly increasing the ultimate costs of completing the rehabilitation.

On December 18, 1989, plaintiffs filed suit in the District Court for the District of Connecticut, alleging that defendants had committed and conspired to commit a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968. Plaintiffs also alleged a host of state law claims.

The district court dismissed plaintiffs' complaint. The court reasoned that plaintiffs (1) failed to plead at least two predicate acts with particularity as to defendants Harrity and Handler & Friar; (2) failed adequately to plead that Anderson, CHFC and Imagineers engaged in a pattern of racketeering activity; and (3) failed to allege an agreement between the defendants to conspire to violate RICO. The district court then declined to exercise pendant jurisdiction over plaintiffs' state law claims.

We agree with the district court's reasoning on grounds (1) and (3). We do not reach ground (2) because we think that plaintiffs have also failed to plead adequately that defendants Anderson, CHFC, and Imagineers committed two predicate acts. Accordingly, we affirm the decision of the district court without considering whether, if properly pled, Anderson's conduct would constitute a pattern of racketeering activity.

*Discussion*

■ A district court should grant a motion to dismiss a RICO claim only if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *H.J., Inc. v.*

*Northwestern Bell Tel. Co.,* 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2905–06, 106 L.Ed.2d 195 (1989) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)). In applying this standard, the district court must "read the facts alleged in the complaint in the light most favorable to petitioners." *Id.,* 492 U.S. at 249, 109 S.Ct. at 2906.

■ In order to prevail, a civil RICO plaintiff must establish that defendants "conduct[ed] or participate[d] ... in the conduct of [an] enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Racketeering activity includes a whole host of criminal acts, including mail fraud and extortion. § 1961(1). The elements of a "pattern of racketeering activity" are not well defined. At a minimum, plaintiffs must demonstrate "at least two acts of racketeering activity" within a ten year period. § 1961(5).

Plaintiffs assert that they have alleged at least six predicate acts of racketeering activity. They identify the following mail frauds. (1) Pre-bid mailings by HUD containing fraudulent descriptions of the number of units eligible for HUD subsidies and the condition of the units; (2) a March 30, 1986 letter from HUD to Macgall's project supervisor, Madden, purporting to disqualify Madden from participating in the project; (3) a letter from Anderson to Macgall, dated April 9th, 1986, reneging on the financing terms offered to Macgall before the bidding; (4) a letter, dated May 19, 1986 from Handler & Friar to Macgall, setting forth a proposal for architectural services; and (5) a letter from Anderson to Macgall, dated June 16th, 1986, instructing Macgall to cease construction until the closing of the construction loan. In addition, plaintiffs allege a single act of attempted extortion by Anderson in the March 21 meeting when Anderson threatened to "bury" Macgall. We will consider each of these allegations in turn.

1. Mail Fraud.

■ To prove a violation of the mail fraud statute, plaintiffs must establish the

existence of a fraudulent scheme and a mailing in furtherance of the scheme. *See Schmuck v. United States*, 489 U.S. 705, 712, 109 S.Ct. 1443, 1448, 103 L.Ed.2d 734 (1989); *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). While there is no requirement that the defendant personally mail a letter, the plaintiff must show "1) that the defendant 'caused' the mailing ... and 2) that the mailing was for the purpose of executing the scheme or ... 'incidental to an essential part of the scheme.'" *United States v. Bortnovsky*, 879 F.2d 30, 36 (2d Cir.1989) (quoting *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954)).

 Allegations of mail fraud must be made with the particularity. required by Federal Rule of Civil Procedure 9(b). *Celpaco, Inc. v. MD Papierfabriken*, 686 F.Supp. 983, 989 (D.Conn.1988). Pursuant to this higher pleading standard, the "complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989). Plaintiffs asserting mail fraud must also identify the purpose of the mailing within the defendant's fraudulent scheme. *See Sun Sav. & Loan Assoc. v. Dierdorff*, 825 F.2d 187, 196 (9th Cir.1987) (mail fraud adequately pled where complaint described letters' date, content, origin, destination, and role in fraudulent scheme); *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir.1990) (dismissing complaint that failed to allege how misrepresentations furthered fraudulent scheme); *Celpaco, Inc.*, 686 F.Supp. at 989. Applying these standards, we now turn to the facts of the case.

(a) *The pre-bid mailings.*

Macgall alleges that the HUD prospectus and bid kit contained fraudulent descriptions of the condition of the project, the number of units eligible for HUD subsidies, and the financing available. Further, Macgall asserts that with respect to the condition of the project, HUD had actual (or at least constructive) knowledge that the condition was worse than represented. We think there is ground to argue that Macgall has adequately pled that these pre-bid mailings were fraudulent.

The district court, however, refused to consider the pre-bid mailings. The court reasoned that these mailings had occurred before the start of Anderson's fraudulent scheme and thus were outside the purview of the mail fraud statute. *See United States v. Tarnopol*, 561 F.2d 466, 471–72 (3rd Cir.1977). While we are reluctant to set firm temporal restraints on mail fraud allegations, we do agree that the mail fraud statute punishes only mailings that have a place in a fraudulent scheme. *Celpaco, Inc.*, 686 F.Supp. at 991. Far from being a part of the scheme to force Macgall to relinquish the project, the alleged fraudulent inducement of Macgall's bid is directly contrary to that scheme.

Macgall has never explained how Anderson's scheme was furthered by using false statements to lure Macgall into bidding for the project. Indeed, Macgall claims that Anderson's purpose was to assist Rothstein in monopolizing the HUD market in Hartford. Surely such a scheme would have been ill served by a series of fraudulent representations designed to induce a competitor to acquire a desirable project.

In any event, the pre-bid fraud can not possibly count towards establishing a pattern of racketeering activity. In order "to prove a pattern of racketeering activity a plaintiff ... must show that the racketeering predicates are related". *H.J., Inc.*, 492 U.S. at 239, 109 S.Ct. at 2900. The pre-bid acts here are related to the post-bid acts only in the sense that they allegedly involve the same parties. The acts have conflicting goals and thus are unrelated for RICO purposes. A RICO claim, replete with the ruinous threat of treble damages, can not be assembled by cobbling together plainly inconsistent allegations of fraud. Accordingly, the district court correctly refused to consider the pre-bid mailings.

(b) *March 31 letter to Madden.* Plaintiffs allege that on March 31, 1986, Joseph Madden received by mail from HUD a "Notice of Temporary Denial of Participation" in the development of the project. Macgall alleges that the temporary disqualification of their project manager delayed the closing on the project. Viewing the allegation in a light most favorable to Macgall, we agree that this letter might have been in furtherance of a fraudulent scheme to cause Macgall to forfeit the project.

However, it is far less clear that this letter can be connected to any participant in the alleged scheme. The letter was signed by HUD's Hartford office manager, William Hernandez. Hernandez, however, is not a defendant in this lawsuit. The only defendant who worked at HUD is William Harrity, who was Manager of the Housing Management Division and the Property Distribution Division of HUD's Hartford office. Even if we assume that the letter is fairly attributable to Harrity, this is the only predicate act to which plaintiffs have linked Harrity. However, the bare minimum of a RICO charge is that a defendant personally committed or aided and abetted the commission of two predicate acts. *H.J., Inc.*, 492 U.S. at 237, 109 S.Ct. at 2899; *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985). Accordingly, this letter alone can not support a RICO charge against Harrity.

The other defendants have even less connection to this letter. Macgall does not attempt to connect Handler and Friar. Macgall does make conclusory assertions that Anderson was "behind" this letter. The only factual predicate on which this is based is the statement that *Madden* believed that Anderson was the source. Even viewed in the light most favorable to Macgall, such a conclusory allegation is insufficient to meet the pleading requirements of Rule 9(b).

(c) *April 9 letter to McLaughlin and Gall.* Plaintiffs allege that in this letter, Anderson informed them that CHFC could no longer offer financing on the terms discussed in their pre-bid conversations. It is possible that this allegation states a claim for breach of contract. To the extent that Anderson knew at the time of the pre-bid conversations that the offered financial terms would not actually be available, Macgall may also have stated a fraud claim. However, that fraud constituted fraud in luring Macgall into the project. Macgall's RICO complaint is founded on a theory of fraudulent efforts to force them off the project. For the same reasons that the pre-bid mailings are not relevant to Macgall's claim, so to this pre-bid fraud allegation is unrelated to, indeed directly contradicts, Macgall's RICO allegations.

In order to connect the April 9 statements into Macgall's RICO theory, Macgall would have to allege that the April 9 statements were part of a fraudulent attempt to force Macgall to relinquish the project. While Macgall would not need to allege that the letter itself was fraudulent, *Schmuck*, 489 U.S. at 715, 109 S.Ct. at 1450, Macgall would have to plead the existence of a post-bid fraudulent scheme of which this letter was incidental to an essential part. *Id.* at 711, 109 S.Ct. at 1447. Macgall has failed to identify any such fraudulent scheme.

Certainly, Macgall has alleged that the April 9th letter was part of some sort of wrongful conduct. An allegation of wrongful conduct, however, is insufficient since "not every use of the mails or wires in furtherance of an unlawful scheme to deprive another of property constitutes mail or wire fraud." *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 536, 112 L.Ed.2d 546 (1990); *United States v. Kreimer*, 609 F.2d 126, 128 (5th Cir.1980) ("[T]he [mail fraud] statute does not reject all business practices that do not fulfill expectations, nor does it taint every breach of a business contract.") The mail fraud statute requires some element of deception. *See* § 1341 (identifying prohibited conduct as "devis[ing] ... any scheme or artifice to defraud, or for obtaining money or property by false or fraudulent pretenses, representations, or promises"); *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406 (3d Cir.1991) (scheme

"must involve some sort of fraudulent misrepresentation or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension"); *McEvoy Travel Bureau,* 904 F.2d at 791 ("the scheme must be intended to *deceive* another") (emphasis in original); *United States v. Starr,* 816 F.2d 94 (2d Cir.1987) (requiring use of a scheme or artifice). This element of deception requirement is satisfied where the mailing itself is misleading or where there is some other deception which the mailing serves. Here, there is neither.

The April 9 letter itself is not deceptive. Plaintiffs do not allege that they were falsely advised of new financing arrangements. In fact, they actually complied with the terms of the April 9 letter.

Nor have plaintiffs identified any other post-bid deception. Plaintiffs' RICO case statement identifies seven acts by defendants that are allegedly part of the post-bid scheme.[1] Of these seven, only one contains an allegation of deception—that Anderson compelled plaintiffs "to pay an exorbitant sum for architectural plans and specifications that were incomplete, deceptive, and obsolete." However, the only specific flaw in the plans identified by plaintiffs is that the plans failed to reveal that structural deficiencies in one of the buildings made it not worth repairing. Plaintiffs complain that "this information was concealed from plaintiffs prior to the bid." Thus, the only deception identified by plaintiffs was part of the pre-bid, not

post-bid, scheme. Accordingly, the April 9 letter was not a post-bid mail fraud.

(d) *June 16 letter.* Plaintiffs allege that in the June 16 letter, Anderson instructed them not to start construction on the project until the closing of the construction loan. As with the April 9 letter, plaintiffs have failed to explain in what way the June 16 letter was part of a fraudulent scheme. It may have breached pre-bid promises or revealed a pre-bid misrepresentation, but plaintiffs have not alleged any facts from which it could be concluded that the June 16 statements were false when made. Instead, plaintiffs allege that Anderson did prevent them from beginning construction until the closing of the loan. As with the April 9 letter, the June 16 letter fails because it is not fraudulent in and of itself and because plaintiffs have failed to describe a post-bid fraudulent scheme that the June 16 letter furthered.

(e) *Handler & Friar proposal sent to Macgall.*

Plaintiffs also point to a "schedule of values" sent by Handler & Friar to Macgall on May 19, 1986. This schedule of values controlled how much CHFC would reimburse Macgall for various portions of the rehabilitation. The district court did not decide whether fraud had been adequately alleged with respect to this letter. Instead, the court noted that this potential mail fraud was the only predicate act allegedly committed by defendant Handler & Friar. Accordingly, the court dismissed the com-

---

1. The seven acts identified in the RICO case statement are:

"(i) withholding and delaying the promised acquisition and construction financing necessary for the plaintiffs to purchase and rehabilitate the project;

(ii) changing the terms and conditions required for plaintiffs to obtain the necessary financing;

(iii) compelling plaintiffs to employ architects (Handler and Friar) previously in the employ of Anderson and CHFC and to pay an exorbitant sum for architectural plans and specifications that were incomplete, deceptive, and obsolete;

(iv) compelling plaintiffs to employ subcontractors according to unreasonable and imprudent terms and conditions;

(v) impairing plaintiffs' ability to complete rehabilitation work on the Project within the

required one-year construction period by wrongfully instructing plaintiffs not to commence rehabilitation work with their own funds until after the closing of the rehabilitation loan, that any work so done would be deemed a preconstruction start for which no funds would be loaned by CHFC, that any work started before the loan closing was subject to being undone, ripped out, or removed, and that Anderson and CHFC would assert sole authority to perform inspections, supervise and control all work;

(vi) wrongfully refusing to conduct or authorize inspections of the work until after the rehabilitation loan was in place; and

(vii) wrongfully delaying closing on the acquisition loan until May 8, 1986 and on the rehabilitation loan until November 6, 1986."

plaint against Handler and Friar. Since plaintiffs have failed to link Handler & Friar to any other predicate act, we agree with the district court's analysis.

Moreover, Macgall has failed to specify any way in which the schedule was fraudulent or furthered a fraudulent scheme. Accordingly, to the extent that Anderson can be linked to the schedule, the schedule can not establish the deception element of the mail fraud claim against Anderson.

2. Extortion.

■ Plaintiffs assert that Anderson attempted to extort them into entering into a joint venture with Rothstein. In order to make out a claim of extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, Macgall needs to show that Anderson (1) induced Macgall, with Macgall's consent, to part with property, (2) through the wrongful use of actual or threatened force, violence or fear (including fear of economic loss), (3) in such a way as to adversely effect interstate commerce. *United States v. Boylan*, 898 F.2d 230, 252 (1st Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990); *United States v. Covino*, 837 F.2d 65, 68 (2d Cir.1988); *United States v. Capo*, 817 F.2d 947, 950–51 (2d Cir.1987) (en banc).

■ The district court, applying the stringent pleading requirements of rule 9(b), refused to consider what it characterized as Macgall's "vague and conclusory allegations" of extortion. However, rule 9(b) applies only to claims of fraud or mistake. *See Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 26 n. 4 (2d Cir. 1990) (refusing to apply 9(b) pleading standards to RICO conspiracy allegation). Accordingly, the district court erred in summarily rejecting the extortion claim. Instead, the court should have evaluated the claim against the more lenient pleading standards of Federal Rule of Civil Procedure 8(a).

■ Reviewed under this more lenient standard, Macgall adequately pled an extortion claim. Anderson's threat to lose Macgall's requisition forms plainly amounted to a use of fear of economic loss in an effort to force Macgall into a joint venture with Rothstein. *See Covino*, 837 F.2d at 68. That the extortion effort ultimately failed can not exonerate Anderson, since Macgall alleged, and the Hobbs Act forbids, attempted extortion. *See* 18 U.S.C. § 1951(a). Accordingly, we conclude that Macgall adequately alleged a single predicate act of attempted extortion.

Plaintiffs' extortion allegations also include several acts that followed Macgall's refusal to bring Rothstein into the deal. These include requiring Macgall to reimburse Anderson for the cost of Handler & Friar's architectural plans, changing the terms of the loan agreement such that Macgall had to pay higher interest rates (the April 9 letter), ordering Macgall not to start construction until the construction financing was in place (the June 16 letter), and failing to make prompt payments on requisitions. Plaintiffs neither explain how Anderson "forced" Macgall to agree to any of these changes, nor identify any threats made by Anderson with respect to these changes. Accordingly, these actions do not meet the Hobbs Act definition of extortion. At best, they are examples of Anderson's "making good" on his threat to bury Macgall if they did not bring Rothstein in on the project. Accordingly, we conclude that Macgall has adequately pled only a single predicate act of attempted extortion.

3. Conspiracy.

Macgall also alleged a conspiracy to commit a RICO violation. The district court dismissed this claim on the ground that Macgall had failed to allege an agreement to commit two or more racketeering offenses. *See Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir.1990). We agree with the district court's analysis on this point.

In sum, a careful review of Macgall's complaint and RICO case statement reveals that Macgall has failed to allege that any defendant committed more than a single act of racketeering. Accordingly, we affirm the district court's dismissal of Macgall's complaint.

*Leave to Amend the Complaint*

Plaintiffs assert that, whatever the shortcomings of their allegations, the district court abused its discretion in failing to grant leave to amend the complaint. We note at the outset that plaintiffs never moved to amend their complaint. Plaintiffs merely stated, in a footnote in a memorandum to the district court, that: "Although plaintiffs have satisfied the requirements of Fed.R.Civ.P. 9(b), they respectfully request leave to replead to the extent the Court determines that the Complaint fails to provide adequate specificity." The district court, in dismissing the complaint, neither granted nor denied leave to amend.

■ Of course, the lack of a formal motion is not sufficient ground for a district court's dismissal without leave to amend, so long as the plaintiff has made its willingness to amend clear. *See Oliver Schools, Inc. v. Foley*, 930 F.2d 248, 252–53 (2d Cir.1991); *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir.1990). Nonetheless, the matter is reserved to the discretion of the district court. *Ronzani*, 899 F.2d at 198. Here, we do not think that the district court's failure to grant leave to amend was an abuse of discretion.

■ Plaintiffs here have already had one opportunity to amend their pleadings. Plaintiffs filed their first complaint on December 18, 1989. Shortly thereafter, the district court issued a "RICO Case Order" directing the plaintiff to file within 20 days a detailed statement including *inter alia* "the alleged misconduct of each wrongdoer," a "[l]ist [of] the alleged predicate acts," "the dates of the alleged predicate acts, the participants in the predicate acts, and a description of the facts surrounding the predicate." Plaintiffs attempted to comply with the order, submitting a lengthy and detailed RICO Case Statement. The district court dismissed the action only after considering all the allegations in both the Case Statement and the complaint. The plaintiffs then opted to appeal rather than seek reconsideration based on amended pleadings. *See Executive Photo, Inc. v. Norrell*, 765 F.Supp. 844, 845 (S.D.N.Y. 1991). Given the specific and detailed direction provided to the plaintiffs and the plaintiffs' failure to file either a motion to amend or a motion to reconsider, we find no abuse of discretion in the district court's failure to grant leave to amend.

*Conclusion*

For the foregoing reasons, the district court's order dismissing the complaint is hereby affirmed.

PARKER, Chief District Judge, concurring in the result:

Although I agree with substantial portions of the majority opinion and concur in its ultimate conclusion, I believe that the majority reads the pleadings too narrowly in certain regards and that there is a preferable ground for affirmance.

I.

I agree with the majority that in order to prevail plaintiffs must allege "at least two acts of racketeering activity" within a ten year period. *Ante* at 190, 192. I also agree that plaintiffs properly alleged a predicate act of extortion in their claim that Anderson threatened economic harm if plaintiffs refused to bring Rothstein into the deal. *Ante* at 194.

Contrary to the majority view, however, it seems to me that a fair reading of the Complaint and Plaintiffs' RICO Case Statement leads to the conclusion that the plaintiffs have alleged at least three predicate acts of mail fraud in addition to the extortion.

First, plaintiffs allege that defendants made material misrepresentations as to the terms of the deal in two pre-bid mailings—the January 1986 mailing of the HUD Prospectus and Invitation to Bid, and the March 1986 mailing of the HUD "Bid Kit." Both of these mailings are alleged to further a fraudulent scheme to induce plaintiffs to submit a bid on the project. They constitute well-pleaded acts of mail fraud. See 18 U.S.C. § 1341. Although the scheme to induce plaintiffs' bid through fraud, as the majority points out, is ostensibly in tension with the subsequent scheme

to cause plaintiffs to relinquish their ownership in the property, both schemes are nevertheless set forth with adequate clarity in the pleadings.[1]

Furthermore, the fact that the two schemes may have contrary purposes does not mean that predicate acts done in furtherance of each may never be considered concurrently to prove a "pattern of racketeering activity" under RICO. RICO acts of course must be "related" in order to form a pattern, but the relationship may be considerably more tangential than is suggested by the majority. In *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court adopted as the definition of relatedness for RICO purposes the broad definition given by Congress in Title X of the Organized Crime Control Act of 1970, Pub.L. 91–452, 84 Stat. 922 (of which RICO formed Title IX): Two criminal acts are related if they " 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " 492 U.S. at 240, 109 S.Ct. at 2901 (quoting 18 U.S.C. § 3575(e)). "We have no reason to suppose that Congress had in mind for RICO's pattern of racketeering component any more constrained a notion of the relationships between predicates that would suffice." *Id.* As a matter of law, therefore, acts with conflicting goals may nonetheless be "related" for RICO purposes if they satisfy other criteria of relatedness.

All of the alleged predicate acts relate to plaintiffs' efforts to acquire and rehabilitate the HUD project in Hartford in 1986, and both schemes were allegedly perpetrated by the same persons and organizations. In my view, these common features easily satisfy the relatedness requirement as explicated in *H.J., Inc.*, despite an apparent conflict of goals.

Second, I believe that at least one, and probably two, of the post-bid mailings qualify as well-pleaded predicate acts of mail fraud. Specifically, I disagree with the majority in its conclusion that the April 9th letter to McLaughlin and Gall was not deceptive and, therefore, did not constitute an act of mail fraud. Plaintiffs allege that the defendants had a scheme to defraud, the purpose of which was "to cause plaintiffs such severe financial harm that they would be forced to abandon the Project...." (Complaint ¶ 4, Joint Appendix at 37.) The claim is that the alleged scheme was played out through a series of acts, which occurred after plaintiffs had rejected Anderson's attempt to force a joint venture with Rothstein by the use of extortion. (Plaintiff's RICO Case Statement at 20, J.A. at 92.) Among those acts was the April 9th letter, in which Anderson claimed that financing would be available only on more onerous and costly terms than had previously been promised. (J.A. at 96).

Given the context in which the mailing occurred, the clear implication of the pleadings is that Anderson was fraudulently demanding onerous terms in order to force plaintiffs off the project. Similarly, the mailing of June 16, 1986 falsely claimed that any work done by plaintiffs by way of an early start could not be considered as eligible for "prior start reimbursement." I believe that these mailings, read in conjunction with the extortion allegation, constitute well-pleaded predicate RICO acts of mail fraud.[2]

In my view, the RICO remedy is unavailing in this case, however, because plaintiffs' allegations fail to satisfy the "continuity" element of a RICO pattern.

## II.

The alleged schemes consisted of *at most* a small number of mail fraud offenses and one act of attempted extortion

---

1. The pleadings are not a model of clarity. While plaintiffs often refer to *a* or *the* scheme, they also refer in the Complaint to "schemes to defraud," and describe a scheme to fraudulently induce plaintiffs' bid in ¶¶ 15–20 and 38 of the Complaint.

2. This analysis is bolstered by the Complaint's general allegations of fraud *and* extortion (¶¶ 3 and 4), plus the RICO Case Statement's charge that the entire deal was arranged by Anderson and Harrity to direct the project to Rothstein by use of both threats and fraud (J.A. at 89, 90, 92).

committed over a period of some six months (January to June 1986) by persons otherwise engaged in legitimate businesses. Such are the temporal limits of the well-pleaded allegations of a racketeering pattern.

On appeal, plaintiffs attempt to transcend these limits by insisting that the Complaint alleges fraudulent conduct by Anderson for a fifteen-month period, from January 1986 through March 1987. But general allegations of fraud, even if made with requisite particularity, do not *ipso facto* constitute allegations of "racketeering activity" under RICO. Racketeering activity includes *mail* fraud as made unlawful in 18 U.S.C. § 1341—but not common-law fraud.[3]

To prove a "pattern of racketeering activity," a RICO plaintiff must show that the alleged predicate acts are both related in the relevant sense and amount to, or threaten the likelihood of, "continued criminal activity." *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. at 237, 109 S.Ct. at 2899. The continuity element is satisfied by showing *either* the commission of related predicate offenses during "a closed period of repeated conduct" that lasts a "substantial period of time" *or* the threat thereof, that is, "past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241–42, 109 S.Ct. at 2901–02. "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *Id.* at 242, 109 S.Ct. at 2902. Under this

standard, plaintiffs' allegations fail to demonstrate the requisite continuity.

The facts of *H.J., Inc.* stand in contrast to those alleged here. In that case the Supreme Court found that a pattern of racketeering activity had been properly pleaded where the complaint alleged

> that at different times over the course of at least a 6–year period the [telephone company officers and employees] gave five members of the [Minnesota Public Utilities Commission] numerous bribes, in several different forms, with the objective—in which they were allegedly successful—of causing these commissioners to approve unfair and unreasonable rates for Northwestern Bell.
>
> .... [P]etitioners claim that the racketeering predicates occurred with some frequency over at least a *6–year period, which may be sufficient to satisfy the continuity requirement.* Alternatively, a threat of continuity of racketeering activity might be established at trial by showing that the alleged bribes were a regular way of conducting Northwestern Bell's ongoing business, or a regular way of conducting or participating in the conduct of the alleged and ongoing RICO enterprise, the MPUC.

*Id.* at 250, 109 S.Ct. at 2906 (emphasis added).

This Circuit has explored the continuity element of a RICO suit in two recent *en banc* decisions. In *United States v. Indelicato*, the court held that a RICO pattern was established where the defendant, who committed three murders almost simultaneously, was a member of an organized crime family. "Where the enterprise is an

---

**3.** I do not suggest that allegations of ongoing fraud may never be considered in a RICO action. An ongoing fraudulent scheme may be relevant, for example, to show the likelihood of continued acts of mail fraud into the future. *See United States v. Kaplan*, 886 F.2d 536, 543 (2d Cir.1989); *Beauford v. Helmsley*, 865 F.2d 1386, 1392 (2d Cir.) (*en banc*), *vacated and remanded*, 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 *original decision adhered to*, 893 F.2d 1433 (2d Cir.), *cert. denied*, 493 U.S. 992, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989). But here plaintiffs do not allege that defendants' racketeering conduct was likely to continue beyond the date the complaint was filed in December

1989. At best plaintiffs speculate about an ongoing conspiracy to steer all HUD housing projects in Hartford to Rothstein, and hint that the specific events alleged in the complaint are part of that broader scheme. Thus, RICO Case Statement ¶ 3: "Rothstein procured from defendants Anderson, CHFC, Imagineers and Harrity, ownership and/or management of virtually all housing financed by HUD and/or the Department of Housing in the greater Hartford area." Entirely absent are allegations that such "steering" is likely to continue into the future or, even if it were, that it would involve racketeering predicates such as mail fraud or extortion.

entity whose business is racketeering activity, an act performed in furtherance of that business automatically carries with it the threat of continued racketeering activity." 865 F.2d 1370, 1383–84 (2d Cir.) (*en banc*), *cert. denied*, 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989). And in *Beauford v. Helmsley*, the court held that a threat of continuity was adequately pleaded where the alleged fraudulent scheme used the mails to sell and convert into condominiums over 8,000 apartments and "there was reason to believe that similarly fraudulent mailings would be made over an additional period of years." 865 F.2d 1386, 1392 (2d Cir.), *vacated and remanded for further consideration in light of H.J., Inc.*, 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584, *original decision adhered to*, 893 F.2d 1433 (2d Cir.), *cert. denied*, 493 U.S. 992, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989). *See also Jacobson v. Cooper*, 882 F.2d 717, 720 (2d Cir.1989) (continuity adequately alleged where related predicates extended over "a matter of years"). Unlike *Indelicato*, the enterprise in this case is not one whose business is racketeering activity; as plaintiffs concede, the defendants are all engaged in otherwise legitimate businesses and that, in committing the racketeering activities alleged, they "subverted the legitimate, usual, and daily activities of the Enterprise." RICO Case Statement, Responses to ¶¶ 7 and 8. Unlike *Beauford*, no suggestion is made that similar racketeering predicates will occur over an additional period of years—or, for that matter, into the future at all.

The continuity requirement was also addressed at length in *Procter & Gamble Co. v. Big Apple Industrial Bldgs., Inc.*, 879 F.2d 10 (2d Cir.1989), *cert. denied*, 493 U.S. 1022, 110 S.Ct. 723, 107 L.Ed.2d 743 (1990), where this court found a pattern of racketeering activity adequately pleaded to survive a motion to dismiss. The case involved contracts for the lease, construction and financing of a television and motion picture production facility. The defendants, owners of the building and contractors for the renovation project, allegedly made numerous misrepresentations relating to their experience and expertise, to

anticipated costs, and to the site's potential. The plaintiffs also accused them "of repeated illegal siphoning of project funds." *Id.* at 13. The district court had dismissed the complaint, finding "that the necessary element of continuity was lacking principally because the 'single, finite project' was not of a continuing nature." *Id.* at 18. This court reversed, stating:

> A pattern of racketeering activity may be discerned from the facts alleged in plaintiffs' 77-page complaint. It claims that defendants engaged in at least five separate fraudulent schemes: (1) inducing execution of the ten-year studio lease by fraudulently misstating their experience, expertise, and construction cost estimates; (2) inducing plaintiffs to continue with the project, and inducing P & G to guarantee construction financing by fraudulently misrepresenting and concealing costs; (3) fraudulently diverting construction funds and charging excessive professional and other fees; (4) improperly escrowing construction loan funds to build a "cushion" against discovery of the alleged fraud; and (5) fraudulently scheming to collect "interim rent" for delays primarily caused by defendants.
>
> These violations of the Federal Mail Fraud Act, resulting from written and oral misrepresentations as to defendants' expertise, as to construction costs, and from sending false and excessive invoices and certifications over a period of nearly two years, are not isolated or sporadic actions. While multiple schemes are not essential for demonstrating continuity or a threat of continuity, here it is alleged that defendants conducted fraudulent business activities on a number of fronts in five separate schemes.

*Id.* (citations omitted). The third, fourth and fifth of the fraudulent schemes in *Big Apple* are of the type that would likely continue through the duration of the ten-year lease. The complaint in *Big Apple* thus alleged a series of mail frauds substantially longer in duration than the schemes alleged in the present pleadings.

RICO is a powerful weapon for civil litigants in federal court. But it is not a weapon for all purposes. What defendants are alleged to have done in this case, no matter how fraudulent, is not the type of sustained criminal conduct RICO reaches. Counting all the properly pleaded predicate acts, plaintiffs simply have failed to allege a sufficient factual basis for finding a pattern of racketeering by any of the defendants as required under 18 U.S.C. § 1962(c). That was the conclusion of the district court and I would affirm its dismissal of the action on that basis.