## In re SUMITOMO COPPER LITIGATION.

### No. 96 Civ. 4584(MP).

United States District Court, S.D. New York.

March 11, 1998.

## OPINION AND DECISION

POLLACK, Senior District Judge.

Global Minerals and Metals Corp. ("Global") and R. David Campbell ("Campbell"), (collectively referred to as the "Global Defendants") move pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure to dismiss the Second Claim of the Second Consolidated Class Action Complaint (the "Complaint"), brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), U.S.C. § 1961, *et seq.* (the "Second Claim").

### Background

Plaintiffs allege that Sumitomo Corporation ("Sumitomo"), through its head copper trader Yasuo Hamanaka ("Hamanaka"), and other parties, including the Global Defendants, manipulated the price of copper on the London Metal Exchange (the "LME"), and thereby by implication on the COMEX division of the New York Mercantile Exchange ("Comex"), for approximately seven years, from 1989 to 1996.

Specifically, between February, 1995 and June, 1996, defendants allegedly manipulated prices of copper futures contracts by purchasing and holding "unneeded" copper exchange contract long positions, thereby restricting available supply. Allegedly, as a result of the manipulation, copper prices reached an artificially high level. The purported scheme collapsed under regulatory scrutiny, at which time Sumitomo fired Hamanaka and liquidated its positions at a loss.

Plaintiffs allege that during 1995–96, after regulators became suspicious, Sumitomo and Global Defendants opened brokerage accounts together in Sumitomo's name, but as to which Global Defendants held a power of attorney and managed the trading. Plaintiffs claim this was done to exert maximum effect upon prices and to deflect the regulators attention away from Sumitomo. Plaintiffs further allege that Global Defendants and Sumitomo regularly discussed and coordinated their price manipulation and that they acted in concert in making false statements to the market place and regulators. This concerted action in manipulating the copper market forms the factual basis for the RICO claims at issue in this motion.

The Global Defendants assert that the Second Claim consists of no more than news articles, rumors and generalized allegations which defendants "will at the appropriate time prove to be baseless." They argue that the Second Claim is deficient in the following respects: 1) the Global Defendants are not alleged to have participated in the operation or management of a "RICO enterprise"; 2) the alleged predicate acts of mail fraud and wire fraud are not sufficiently particularized; and 3) Plaintiffs have not pled reliance on any acts of mail or wire fraud.

For the purposes of this motion, the factual allegations of the Second Consolidated Class Action Complaint are accepted as true, and all inferences are drawn in favor of the pleader. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993).

### Discussion

A. *Sufficiency of RICO Enterprise Allegations*

To state a RICO claim, a plaintiff must allege that defendants "conduct[ed] or participat[ed] ... in the conduct of [an] enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). RICO defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The enterprise may be "proved by evidence of an ongoing organization, formal or informal, and

by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). This Circuit construes the enterprise element of RICO liberally: "[T]he language and the history [of RICO] suggest that Congress sought to define the term as broadly as possible...." *United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir.), *cert. denied*, 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989) (en banc).

■ Here, the alleged structure of the enterprise is clear from the Complaint. Although Sumitomo and Global were distinct legal entities, they opened joint accounts with Merrill Lynch, Morgan Stanley and Rudolf Wolff in Sumitomo's name, but as to which Global and Campbell had a power of attorney and played some role in the management of trading. In the Merrill Lynch account, the Global Defendants are alleged to have used Sumitomo's credit to make purchases. Through these joint accounts, as well as through their individual accounts, Sumitomo and Global are alleged to have coordinated their copper trading in an effort to manipulate prices. This is a sufficient allegation of a RICO enterprise.

■ Additionally, to be subject to RICO liability, a defendant must have participated, directly or indirectly, in the operation or management of the enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 183, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). Liability is not limited to those primarily responsible for an enterprise's affairs, in upper management, or who occupy a formal position in the enterprise, but may attach even to "lower-rung participants in the enterprise who are under the direction of upper management."[1] *Id.* at 183–84. However, "*some* part in directing the enterprise's affairs is required." *Id.* at 184.

Although Global Defendants contend that they merely acted at Sumitomo's behest, the Complaint alleges, at a minimum, "substantial assistance" on the part of the Global Defendants in the overall manipulation scheme. *See Napoli v. United States*, 45 F.3d 680, 683 (2d Cir.), *cert. denied*, 514 U.S. 1084, 115 S.Ct. 1796, 131 L.Ed.2d 724 and 514 U.S. 1134, 115 S.Ct. 2015, 131 L.Ed.2d 1014 (1995). Global Defendants are alleged to have coordinated their trading activities and public statements with Sumitomo and, at least, of acting under the direction of Sumitomo by purchasing copper exchange contracts through the joint accounts. At this early stage, these allegations are sufficient to satisfy *Reves*.

■ Contrary to the Global Defendants suggestion, allegations of the existence of a RICO enterprise must meet only the "notice pleading" requirements of Fed.R.Civ.Pro. 8. *Trustees of Plumbers Nat'l Pension Fund v. Transworld Mech., Inc.*, 886 F.Supp. 1134, 1144–45 (S.D.N.Y.1995); *Azurite Corp. v. Amster & Co.*, 730 F.Supp. 571 (S.D.N.Y. 1990). At this time, nothing more is required of Plaintiffs.

### B. Sufficiency of Mail and Wire Fraud Allegations

Under RICO, a "pattern of racketeering activity" consists of "at least two acts of racketeering activity" within a ten year period. *See* 18 U.S.C. § 1961(5); *Sedima, S.P.R.L v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *McLaughlin v. Anderson*, 962 F.2d 187, 190 (2d Cir.1992). Among the predicate acts enumerated in § 1961(1) are any acts of mail fraud indictable under the federal mail fraud statute, 18 U.S.C. § 1341, and any acts of wire fraud indictable under the federal wire fraud statute, 18 U.S.C. § 1343.[2]

---

1. The Supreme Court has declined to decide "how far § 1962(c) extends down the ladder of operation...." *Reves v. Ernst & Young*, 507 U.S. 170, 184 n. 9, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993).

2. The wire fraud statute, 18 U.S.C. § 1343, provides in relevant part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, represen-

tations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both...." The mail fraud statute, 18 U.S.C. § 1341, is similar to the wire fraud statute in all respects material to the present discussion.

Plaintiffs allege that the Global Defendants have committed the predicate acts of mail fraud and wire fraud in carrying out a "master plan" to manipulate and artificially inflate the prices of copper and its derivatives. The elements of a claim of mail or wire fraud are: (1) the existence of a scheme to defraud involving money or property; and (2) the use of the mails or wires in furtherance of the scheme. *See United States v. Trapilo*, 130 F.3d 547, 551–52 (2d Cir.1997); *McLaughlin*, 962 F.2d at 191 (*citing Schmuck v. United States*, 489 U.S. 705, 712, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989)).

■ Contrary to the Global Defendants assertion that each of the elements of common law fraud must be pled to satisfy the first prong of the mail and wire fraud statutes, "[t]he term 'scheme to defraud' is measured by a ' "nontechnical standard. It is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general [and] business life of members of society." ' " *Trapilo*, 130 F.3d at 550 n. 3 (*citing United States v. Von Barta*, 635 F.2d 999, 1005 n. 12 (2d Cir.1980), *cert. denied*, 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981) (*quoting Gregory v. United States*, 253 F.2d 104, 109 (5th Cir.1958).)) In *Trapilo*, the Second Circuit noted that smuggling, an act unlikely to constitute an act of common law fraud, was "an act within the meaning of a 'scheme to defraud' " because it "violate[d] fundamental notions of honesty, fair play and right dealing." *Id. See also, Ray Larsen Associates, Inc. v. Nikko America, Inc.*, 89 CIV 2809, 1996 WL 442799 *5 (S.D.N.Y. August 5, 1996) (noting that "because [the mail and wire fraud statutes] are broader than common law fraud, it is possible for a plaintiff sufficiently to plead mail or wire fraud while nevertheless failing to plead common law fraud.")

To satisfy the second prong of the mail and wire fraud statutes, a plaintiff must show 1) that the defendants "caused" the mailing or use of the wires, "namely that they must have acted 'with knowledge that the use of the mails [or wires] will follow in the ordinary course of business, or where such use

can reasonably be foreseen, even though not actually intended,' " and 2) that the mailing or use of the wires "was for the purpose of executing the scheme or, in other words, 'incidental to an essential part of the scheme.' " *United States v. Bortnovsky*, 879 F.2d 30, 36 (2d Cir .1989) (*quoting Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 98 L.Ed. 435 (1954)).[3]

■ In pleading a violation of the mail and wire fraud statutes, Rule 9(b) of the Federal Rules of Civil Procedure must be satisfied. *Mills*, 12 F.3d at 1176; *German de La Roche v. Calcagnini*, No. 95 CIV. 6322, 1997 WL 292108, at *7 (June 3, 1997, S.D.N.Y.). Rule 9(b) reads: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b).

Rule 9(b) has great "urgency" in civil RICO actions. *Schmidt v. Fleet Bank*, No. 96 CIV. 5030, 1998 WL 47827, *5 (Feb. 4, 1998, S.D.N.Y..) (quoting *Morin v. Trupin*, 778 F.Supp. 711, 716 (S.D.N.Y.1991)). The rationale underlying a strict application of the pleading requirements in civil RICO actions is that merely initiating a RICO action against a defendant can "unfairly stigmatize him as a 'racketeer.' " *Plount v. American Home Assurance Co.*, 668 F.Supp. 204, 205 (S.D.N.Y.1987). Also, "the civil RICO has resulted in a flood of what are and should be state court cases that are being reframed and brought in federal court as RICO actions because of the carrot of treble recovery and the availability of a federal forum." *Id.* Indeed, the "overwhelming trend" amongst the lower courts is to apply Rule 9(b) strictly in order to effect dismissal of civil RICO suits. *See* 16 RICO L.Rep. 1, 79–93 (1992) (index showing disproportionate number of dismissals in civil RICO suits under Rule 9(b)); *see also* Michael Goldsmith, *Judicial Immunity For White Collar Crime: The Ironic Demise of Civil RICO*, 30 Harv.J. on Legis. 1 (1993) (demonstrating, allegedly, that judicial re-

---

**3.** Since the requisite elements of a "scheme to defraud" under the mail and wire fraud statutes are identical, cases construing mail fraud apply to the wire fraud statute as well. *United States v.* *Slevin*, 106 F.3d 1086, 1088 (2d Cir.1996); *United States v. Lemire*, 720 F.2d 1327, 1334–35 n. 6 (2d Cir.1983), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984).

form of the RICO statute by the lower courts has resulted in the demise of civil RICO actions).

■ However, while Rule 9(b) may be construed strictly in the context of civil RICO actions, it should not be applied in a manner which would, in effect, obstruct all plaintiffs, including those with valid claims, from initiating civil RICO actions. RICO clearly provides for civil remedies to benefit victims of racketeering, and in the absence of congressional action, these provisions should not be ignored. *See* 18 U.S.C. § 1964(c); *see also H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) ("RICO may be a poorly drafted statute; but rewriting it is a job for Congress...."). Moreover, even if applied strictly, Rule 9(b) must still be read together with Rule 8(a), which requires a plaintiff to plead only a short, plain statement upon which he is entitled to relief. *See Connolly v. Havens*, 763 F.Supp. 6, 12 (S.D.N.Y.1991).

■ In cases in which a plaintiff claims that specific statements or mailings were themselves fraudulent, *i.e.*, themselves contained false or misleading information, the complaint should specify the fraud involved, identify the parties responsible for the fraud, and where and when the fraud occurred. *See Mills*, 12 F.3d at 1175 (*citing Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989)); *McLaughlin*, 962 F.2d at 191 (2d Cir.1992); *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir. 1986).

■ In cases in which the plaintiff claims that the mails or wires were simply used in furtherance of a master plan to defraud, the communications need not have contained false or misleading information themselves, *See Schmuck*, 489 U.S. at 715. In such cases, a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule 9(b). *Spira v. Nick*, 876 F.Supp. 553, 559 (S.D.N.Y.1995); *Center Cadillac v. Bank Leumi Trust Co.*,

808 F.Supp. 213, 229 (S.D.N.Y.1992), *aff'd*, 99 F.3d 401 (2d Cir.1995). When read appropriately, *Spira* does not fall outside the established rules in this Circuit, as appears from the following extract:

> For one thing, we do not regard mailings in furtherance of the scheme, but which are not themselves false or misleading, as "averments of fraud" within the language of Rule 9(b). For another, it is difficult to see any useful purpose in requiring that a RICO complaint specifically allege each mailing in furtherance of a complex commercial scheme, at least where, as here, the complaint alleges that numerous mailings of particular kinds were made in furtherance of the scheme. Once the plaintiff alleges with particularity the circumstances constituting the fraudulent scheme, neither the reputational interests nor the notice function served by Rule 9(b) would be advanced in any material way by insisting that a complaint contain a list of letters or telephone calls.

*Id.* In complex civil RICO actions involving multiple defendants, therefore, Rule 9(b) does not require that the temporal or geographic particulars of each mailing or wire transmission made in furtherance of the fraudulent scheme be stated with particularity. *Spira*, 876 F.Supp. at 559.[4] In such cases, Rule 9(b) requires only that the plaintiff delineate, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme. *Madanes v. Madanes*, 981 F.Supp. 241, 254 (S.D.N.Y.1997); *Center Cadillac*, 808 F.Supp. at 229; *Beth Israel Med. Ctr. v. Smith*, 576 F.Supp. 1061, 1070– 71 (S.D.N.Y.1983).

■ Here, the Complaint asserts a detailed fraudulent master plan involving coordinated efforts by Global Defendants and Sumitomo to manipulate copper prices. In alleging the predicate acts of mail and wire fraud for the purposes of the RICO claim,

---

4. The holding in *Spira* has been construed by the Global Defendants to be at odds with other of our district court cases. *See German de La Roche v. Calcagnini*, No. 95 CIV. 6322, 1997 WL 292108 (June 3, 1997, S.D.N.Y.); *Old Republic Ins. Co. v. Hansa World Cargo Serv.*, 170 F.R.D. 361 (S.D.N.Y.1997); *Levy v. Aaron Faber, Inc.*,

148 F.R.D. 114 (S.D.N.Y.1993); *Azurite v. Amster & Co.*, 730 F.Supp. 571 (S.D.N.Y.1990). However, in those cases, either the fraud was in the content of the mails and/or wires themselves, or the link between the communications and the overall fraudulent scheme was insufficiently spelled out.

the Complaint refers back to its previous factual allegations, and therefore must be read in conjunction with them. Plaintiffs allege, with the requisite specificity, a scheme whereby Sumitomo and Global Defendants purchased and held unneeded copper exchange contacts long positions in excess of 1,000,000 tons of copper, thereby injecting artificial demand and buying pressure into the supply/demand equation for copper exchange contracts. Global Defendants and Sumitomo are then alleged to have cornered substantially all of the copper available for delivery in copper exchange warehouses and kept the copper off the market, artificially restricting available supply. Among the relevant allegations regarding use of the mails and wires, the Complaint states:

> 56 (b) Campbell ... spoke periodically from Global's office in New York with Sumitomo, per Imamura, by telephone. Global, per Campbell had, during 1995–96, virtually daily contact by interstate wires (telephone and telefax) with Sumitomo, per Hamanaka or Masahiro Mogari, who was a trader on Sumitomo's Copper Team.
>
> ...
>
> 278. **Campbell.** During the Class Period [February 6, 1995 through June 15, 1996], Campbell also used the interstate wires and mails virtually on a daily basis throughout the Class Period to implement the manipulation alleged in paragraphs 41 to 269 hereof, without limitation:
>
> (a) by making phone calls from this District to Hamanaka [in Japan]; and
>
> (b) by making phone calls from this District to Merrill Lynch personnel, including Wolfgang Becker, Jane Walsh and others [in London, England].
>
> 279. **Global.** Global used the interstate wires and mails throughout the Class Period, including without limitation:
>
> (a) by sending faxes and making phone calls to Hamanaka;
>
> (b) by sending faxes and making phone calls to Merrill Lynch personnel, including Wolfgang Becker, Jane Walsh and other [in London, England].

These generalized allegations, when properly read in the context of the specific allegations made previously in the Complaint, are sufficient to plead mail and wire fraud.

"[T]he failure to describe particular letters or telephone calls is not fatal to the complaint.... In light of the complaint's allegations, it is certainly reasonable to infer that mail and/or telephone communications were used in furtherance of the defendants' scheme." *Beth Israel,* 576 F.Supp. at 1071. Moreover "a plaintiff does not have the burden of perfection, and thus a complaint may survive despite its blemishes." *Madanes,* 981 F.Supp. at 253.

Additionally, the somewhat more specific allegations made against Hamanaka may be attributed to the Global Defendants for the purposes of the mail and/or wire fraud statutes. "The defendant need not personally initiate or receive the mailing to be liable for mail fraud, so long as the use of the mails by others was reasonably foreseeable. Any mailing incidental to an essential part of the scheme will be regarded as reasonably foreseeable." *Tribune Co. v.. Purcigliotti,* 869 F.Supp. 1076, 1088 (S.D.N.Y. 1994), *aff'd sub. nom. Tribune Co. v. Abiola,* 66 F.3d 12 (2d Cir.1995) (citations omitted). The Complaint contains the following allegation:

> 277. During the Class Period Hamanaka continued to use the wires and the mails on a daily basis to implement the manipulation as alleged in paragraphs 41 to 269 hereof, including without limitation:
>
> (a) by sending faxes and making phone calls to Campbell in this District;
>
> (b) by sending faxes and making phone calls to Morgan Stanley, per Cross in this District;
>
> (c) by sending faxes or making phone calls to Merrill Lynch, per Tony Ellis and others, in this District; and
>
> (d) by making false statements in phone calls to this District on or about October 15, 1995 and November 6, 1995.

Again, these generalized allegations, when combined with the specific allegations made previously in the Complaint, adequately meet the requirements of Rule 9(b).

*C. Sufficiency of Allegations of Reliance*

In civil RICO claims, this Circuit has required a "causal connection between

the prohibited conduct and plaintiffs injury." *Norman v. Niagara Mohawk Power Corp.,* 873 F.2d 634, 636 (2d Cir.1989). When the predicate acts or mail and/or fraud are alleged, "to establish the required causal connection, the plaintiff [is] required to demonstrate that the defendant's misrepresentations were relied on." *Metromedia Co. v. Fugazy,* 983 F.2d 350, 368 (2d Cir. 1992), *cert. denied,* 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993) (*citing County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1311 (2d Cir.1990)); *see also THC Holdings Corp., v. Tishman,* No. 93 CIV. 5393, 1996 WL 291881, at *4 (May 31, 1996 S.D.N.Y.) (noting that "[a]lthough detrimental reliance is not an element of mail or wire fraud claims generally, a plaintiff seeking to base RICO liability on these predicate acts must prove that its injuries are the result of reliance on the fraud.").

Here, Plaintiffs allege that Global Defendants made misrepresentations to exchange regulators which allowed Global to continue its manipulative trading, thereby proximately causing Plaintiffs' injury. Additionally, Plaintiffs allege that Global and Sumitomo's coordinated price manipulation constituted a fraud on the market.

In *Basic v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the Supreme Court endorsed the fraud on the market theory for the imposition of liability under SEC Rule 10b–5, allowing a presumption of reliance to satisfy Rule 10b–5 where misleading statements were made to the market, though they were not directly relied upon by the plaintiffs. *Id.* at 242–47. The court noted that the presumption is supported by "common sense and probability," i.e. market prices of stock traded on well developed markets reflect all publicly available information. *Id.* at 246. The Supreme Court quoted Congress:

> No investor, no speculator, can safely buy and sell securities upon the exchanges without having an intelligent basis for forming his judgment as to the value of the securities he buys or sells. The idea of a free and open public market is built upon a theory that competing judgment of buyers and sellers as to the fair price of a security brings about a situation where the market price reflects as nearly as possible a just

> price. Just as *artificial manipulation tends to upset the true function of an open market,* so the hiding and secreting of important information obstructs the operation of the markets as indices of real value.

*Id.;* H.R.Rep. No. 1383, 73d Cong., 2d Sess. 11 (1934) (emphasis added).

Aside from the numerous cases in which the fraud on the market theory of reliance has been used by the courts in actions brought under Rule 10b–5, it has been employed by this Circuit in cases involving common law fraud in both securities and commodities cases. *See In re Blech Securities Litig.,* 961 F.Supp. 569, 587 (S.D.N.Y.1997) (noting that "[i]n the context of market manipulation, New York law requires only that a plaintiff allege reliance on the integrity of the market to satisfy the reliance element of a common law fraud case"); *Minpeco, S.A. v. Hunt,* 718 F.Supp. 168, 176 (S.D.N.Y.1989) (upholding a fraud on the market theory of common law fraud under New York law in a case involving the trading of commodity futures contracts). Here, there is no reason to abandon the presumption of reliance in a case involving allegations of market price manipulation simply because the presumption is being invoked in the context of the RICO predicate acts of mail and wire fraud in a commodities case. The commodities markets too are well developed. *See Basic,* 485 U.S. at 246.

## CONCLUSION

The Complaint sufficiently states a claim under RICO and satisfies the requirements of Rule 9(b) Federal Rules of Civil Procedure. The motion to dismiss the Second Claim of the Complaint is denied.

SO ORDERED.