**LAKONIA MANAGEMENT LIMITED (formerly known as Montreux Investment Ltd.), Plaintiff,**

v.

**John W. MERIWETHER, Long–Term Capital V, Ltd., Long–Term Capital Portfolio Co., L.L.C., Long–Term Capital Management, L.P., Bankers Trust Corporation, Barclays PLC, The Chase Manhattan Corporation, Credit Suisse First Boston, Deutsche Bank AG, The Goldman Sachs Group, L.P., Lehman Brothers Holdings Inc., Merrill Lynch and Co., Inc., J.P. Morgan & Co., Inc., Morgan Stanley Dean Witter & Co., Paribas, Societe Generale, Citigroup, Inc. and UBS AG, Defendants.**

No. 99 Civ. 5064 SAS.

United States District Court, S.D. New York.

July 27, 2000.

Melvyn I. Weiss, Jerome M. Congress, Brian C. Kerr, Milberg Weiss Bershad Hynes & Lerach LLP, New York City, for plaintiff.

Thomas P. Puccio, Law Offices of Thomas P. Puccio, New York City, Scott A. Edelman, David R. Gelfand, Richard E. Rosberger, Milbank, Tweed, Hadley & McCloy LLP, New York City, Philip A. Lacovara, Andrew L. Frey, Anthony J. Diana, Mayer Brown & Platt, New York City, for Meriwether and the Fund defendants.

Douglas M. Kraus, Seth M. Schwartz, Skadden, Arps, Slate, Meagher & Flom LLP, New York City, for Bank defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

This action arises out of the near-collapse in September 1998 of the initially heralded, and now infamous, Long Term Capital Hedge Funds (the "LTC Funds"

or "Funds"). Plaintiff Lakonia Management Limited ("Lakonia") is a former investor in the Funds. Plaintiff alleges that defendants—individuals, partnerships and corporations associated with the Funds [1]—violated sections 1962(b) and 1962(d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(b), (d), by engaging in a fraudulent scheme to gain control of the Funds and to "squeeze out" plaintiff and other investors for insufficient consideration. In addition to its federal RICO claims, plaintiff asserts related state law claims for breach of fiduciary duty.

Defendants now move, pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 9(b), to dismiss plaintiff's First Amended Complaint ("Complaint") for lack of standing, for failure to state a claim upon which relief may be granted and for failure to plead fraud with particularity. For the reasons that follow, defendants' motions are granted in their entirety.[2]

## I. Legal Standard

Dismissal of a complaint for failure to state a claim pursuant to Rule 12(b)(6) is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief." *Harris v. City of N.Y.*, 186 F.3d 243, 247 (2d Cir.1999). "The task of the court in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir.

1998) (internal quotations omitted). Thus, to properly rule on such a motion, the court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the nonmovant's favor. *See Harris*, 186 F.3d at 247. Nevertheless, "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) (internal quotations omitted).

In deciding a Rule 12(b)(6) motion, the district court must generally limit itself to facts stated in the complaint, documents attached to the complaint as exhibits or documents incorporated in the complaint by reference. *See Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 138 (2d Cir.1999). However, courts may also consider matters of public record, *see Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir.1998), *cert. denied*, 525 U.S. 1103, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999), as well as "documents either in plaintiff['s] possession or of which plaintiff[ ] had knowledge and relied on in bringing suit", *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). *See also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991) (finding that on motion to dismiss, district courts may consider documents of which plaintiff had actual notice and which were integral to its claim even though those documents were not referred to or incorporated in the complaint).

■ Rule 9(b) sets forth additional pleading requirements with respect to alle-

---

**1.** The sole individual defendant is John W. Meriwether. The remaining corporate defendants fall into the following two groups. Defendants Long–Term Capital V, Ltd. ("LTC V"), Long–Term Capital Portfolio Co., L.L.C. ("LTC Portfolio") and Long–Term Capital Management, L.P. ("LTC Management") are collectively the "Fund Defendants". Defendants Bankers Trust Corporation, Barclays PLC, The Chase Manhattan Corporation, Credit Suisse First Boston, Deutsche Bank AG, The Goldman Sachs Group, L.P. ("Goldman Sachs"), Lehman Brothers Holdings Inc., Merrill Lynch and Co., Inc. ("Merrill Lynch"), J.P. Morgan & Co., Inc. ("J.P.Morgan"), Morgan Stanley Dean Witter & Co., Paribas, Societe Generale, Citigroup, Inc. and UBS AG are collectively the "Bank Defendants."

**2.** Meriwether and the Fund Defendants submitted a joint motion to dismiss the Complaint. The Bank Defendants filed a separate motion to dismiss the Complaint.

gations of fraud. Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." But, under Rule 9(b), "[m]alice, intent, knowledge and other condition of mind of a person may be averred generally." Rule 9(b) "applies to civil RICO claims for which fraud is the predicate illegal act." *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172 (2d Cir.1999).[3]

## II. Background

The facts and allegations set forth below are drawn from the Complaint and Plaintiff's Amended RICO Statement ("RICO Stmt.").[4] They are presumed true for purposes of resolving defendants' motions.

3. As set forth above, defendants also seek dismissal pursuant to Rule 12(b)(1) arguing that plaintiff lacks standing to bring this action. It is unclear whether dismissal for lack of standing is properly sought under Rule 12(b)(6) (failure to state a claim) or Rule 12(b)(1) (lack of subject matter jurisdiction). *See Moore*, 189 F.3d at 169 n. 3; *Rent Stabilization Ass'n of N.Y. v. Dinkins*, 5 F.3d 591, 594 & n. 2 (2d Cir.1993). For purposes of resolving defendants' motions, however, any distinction between the two Rules is academic. Motions for lack of standing under Rule 12(b)(1) are subject to the same legal standard as motions under Rule 12(b)(6); namely, this Court must accept as true all material factual allegations in the Complaint. *See Moore*, 189 F.3d at 169 n. 3; *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir.1992).

4. Pursuant to this Court's Individual Rules and Procedures, within twenty days of filing a claim under RICO, the party asserting the claim must file with the Court and serve upon the opposing party a "RICO Statement." The RICO Statement should include, among other things, a detailed description of the alleged pattern of racketeering activity; the alleged misconduct and basis of liability for each defendant; and the alleged victims and how each victim was injured.

5. The group of nine comprised Victor J. Haghani, Gregory Hawkins, Lawrence Hilibrand, William Krasker, Richard F. Leahy, James J. McEntee, Robert C. Merton, Eric Rosenfeld and Myron S. Scholes. *See* Com-

### A. Parties

#### 1. Meriwether and the Fund Defendants

Defendant Meriwether is a recognized expert in sophisticated investment strategies. Complaint ¶ 36. In 1993, Meriwether, joined by a group of nine similarly renowned financiers, started the LTC Funds. *Id.* ¶¶ 34, 36.[5]

The Funds were composed of various domestic and foreign corporate entities. *Id.* ¶ 34. These entities operated through a bi-level master fund/feeder fund structure as follows. Investors purchased shares in one of several feeder funds. *Id.* The feeder funds in turn invested substantially all of their assets in a single master fund—defendant LTC Portfolio[6]—which

plaint ¶ 36; 2/1/94 Confidential Memorandum for Private Placement of Ordinary Shares of Long–Term Capital, Ltd. ("Offering Memorandum"), Ex. A to Declaration of Matthew H. Hersch in Support of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Hersch Decl."), at 1.

This Court may properly consider the Offering Memorandum because it is incorporated by reference in the Complaint. *See, e.g.,* Complaint ¶¶ 35, 36, 39. In addition, the Offering Memorandum was necessarily distributed to plaintiff in connection with plaintiff's investment in the Funds. *See infra* Part II.A.3.

6. In its Complaint, plaintiff identifies and refers to defendant Long–Term Capital Portfolio Co., L.L.C., a Delaware limited liability company, as the "master fund". Complaint ¶¶ 14, 34. However, as Meriwether and the Fund Defendants note in their motion to dismiss— and as is clear from the plain language of relevant organizational documents—the master fund was, in fact, a Cayman Islands limited partnership called Long–Term Capital Portfolio, L.P. *See* Memorandum of Law in Support of Motion by Defendants John Meriwether and [the Fund Defendants] to Dismiss the Complaint ("Fund Defs.Mem.") at 2 n. 2; Offering Memorandum, Ex. A to Hersch Decl., at 3.

Although plaintiff indicated in its opposition papers that it would "seek to file an amended complaint correcting the name and identification of this defendant", *see* Plaintiff's Memorandum in Opposition to the Motions of John

utilized the capital to make sophisticated and highly-leveraged investments. *Id.* ¶¶ 2, 33–36.[7]

Defendant LTC Management, a Delaware limited partnership, served as investment manager of LTC Portfolio. *Id.* ¶¶ 15, 35. As investment manager, LTC Management had complete investment authority over the assets of LTC Portfolio. *Id.* ¶ 35. Meriwether and his nine colleagues were limited partners and principals of LTC Management. *Id.* ¶ 36. Thus, Meriwether and his colleagues (collectively, the "Principals") effectively controlled the investment of LTC Portfolio's assets. *Id.*

Defendant LTC V, a Cayman Islands limited liability company, was one of the several feeder funds that invested in LTC Portfolio, *Id.* ¶¶ 13, 34, 37. Only those investors with a net worth of $10 million or greater were eligible to purchase shares in LTC V. *Id.* ¶ 37. Meriwether was a director of LTC V. *Id.* ¶ 13.

### 2. The Bank Defendants

Prior to the events of September 1998 which are described in detail below, the Bank Defendants were primarily creditors of the LTC Funds. *Id.* ¶ 45. As set forth *supra* Part II.A.1., the Funds' investment strategy was based upon extensive use of borrowed funds and other forms of leverage. *See also* Offering Memorandum, Ex. A to Hersch Decl., at 10. The Bank Defendants provided the financing necessary to pursue such a strategy on terms highly favorable to the Funds. Complaint ¶¶ 46, 48.

For example, according to the Complaint, creditors typically require debtors to post collateral worth slightly more than the amount loaned. *Id.* ¶ 46. This extra collateral is known as a "haircut." *Id.* Plaintiff alleges that, on many occasions, the Bank Defendants loaned money to the Funds without requiring the Funds to provide "haircuts". *Id.*

In addition to their role as creditors, the Bank Defendants sometimes acted as counterparties for the Funds in derivative contracts such as futures, swaps and options. *Id.* ¶ 47. And, one of the Bank Defendants—Merrill Lynch—invested $22 million in the Funds through a deferred compensation plan. *Id.* ¶ 49. Finally, the Complaint alleges that the Bank Defendants "competed" with the Funds because those defendants "were, and are, heavily involved in financial markets as brokers for customers, as traders for their own proprietary accounts and/or as market makers for various securities also traded by [the Funds]." *Id.*

### 3. Plaintiff

In 1994, plaintiff Lakonia invested $50,039,887 in LTC V through a private offering of LTC V securities. *Id.* ¶ 38.[8] The Offering Memorandum for those securities made clear that investment in LTC V was a high-risk financial venture and warned potential purchasers that returns would be both volatile and uncertain. Offering Memorandum, Ex. A to Hersch

---

Meriwether, Et al. and the Bank Defendants to Dismiss the First Amended Complaint ("Pl. Opp.") at 2 n. 1, it has failed to do so.

7. The stated investment objective of LTC Portfolio was

"to maximize the expected total return on its portfolio on a risk-adjusted basis .... by employing sophisticated analytical models and by undertaking complex proprietary trading strategies on a leveraged basis, primarily in fixed-income securities denominated in any currencies and associat-

ed derivative instruments such as warrants, options, forward contracts, futures contracts and customized contractual agreements."

Complaint ¶ 39 (quoting Offering Memorandum, Ex. A to Hersch Decl., at 3).

8. Lakonia is a limited liability company incorporated in the Island of Jersey, British Channel Islands. Complaint ¶ 11. In 1994, when it purchased shares of LTC V, the company was known as Montreux Investments Limited. *Id.* The company changed its name to Lakonia on September 21, 1998. *Id.*

Decl.[9] Specifically, the Offering Memorandum stated:

> Investment in [LTC V] entails a high degree of risk and is suitable only for sophisticated investors for whom an investment in [LTC V] does not represent a complete investment program and who fully understand and are capable of bearing the risks of an investment in [LTC V].... There can be no assurance that [LTC Portfolio] will be able to achieve its investment objective or that investors will receive a return of their capital, and investment results may vary substantially on a quarterly or annual basis.

*Id.* at 40.

The Offering Memorandum informed prospective purchasers that shares of LTC V were not registered under domestic or foreign securities laws, and that there was no public market for shares of LTC V. *Id.* at (i). In addition, the Offering Memorandum stated that LTC V had authority to mandatorily redeem "all or any part of a Shareholder's Shares at any time and for any reason, in its sole and absolute discretion." *Id.* at 9. Any mandatory redemption would be at the then-current net asset value per share. *Id.*[10] Finally, the Offering Memorandum disclosed that the Principals

would initially invest an aggregate of at least $100 million in LTC Portfolio—as distinct from LTC V. *Id.* at 2.

## B. Operation of the Funds from 1994 through August 1998

Pursuant to its investment strategy, LTC Management leveraged the assets of LTC Portfolio, taking on "huge" amounts of debt. Complaint ¶ 42. For example, in 1996, LTC Portfolio's leverage ratio was approximately 30 to 1. *Id.* That is, LTC Portfolio carried $30 of debt for every $1 of available capital. *Id.*

From late winter 1994 through spring 1998, LTC Management's strategy worked well. *Id.* ¶ 43. Investors earned profits of 20% in 1994; 43% in 1995; 41% in 1996 and 17% in 1997. *Id.* By fall 1997, the reported capital of LTC Portfolio was approximately $7 billion. *Id.* ¶ 44. Similarly, by November 30, 1997, the value of Lakonia's investment in LTC V had increased from $50,039,887 to $137,931,042—a profit of $87,891,155. RICO Stmt. at 77.

In December 1997, after determining that $7 billion was too much capital for the available investment opportunities, the Funds redeemed $2.5 billion worth of shares to investors. Complaint ¶ 44; RICO Stmt. at 77.[11] Pursuant to this

---

9. The Offering Memorandum submitted by plaintiff is entitled "Private Placement of Ordinary Shares of Long–Term Capital, Ltd." rather than "Private Placement of Ordinary Shares of Long–Term Capital V, Ltd." *See* Offering Memorandum, Ex. A to Hersch Decl.; *see also supra* note 5. Regardless of its title, however, the Offering Memorandum clearly served as a generic placement memorandum for several—if not all—of the feeder funds, including LTC V. *See* Pl.Opp. at 4 n. 5; 2/11/94 Long–Term Capital V, Ltd. Subscription Agreement ("LTC V Subscription"), Ex. 1 to 9/20/99 Declaration of Kedi Chang, Custodian of Records for Long–Term Capital, Ltd. and LTC V ("Change Decl."), at 1 (referring investors in LTC V or "other Investment Vehicle[s]" to Offering Memorandum).

10. LTC Portfolio was similarly authorized to redeem all or any portion of the interests of the feeder funds, including LTC V, at any time and for any reason. *See* 2/24/94 Amend-

ed and Restated Limited Partnership Agreement of Long–Term Capital Portfolio, L.P. ("Partnership Agreement"), Ex. 3 to 12/24/99 Affidavit of Seamus Ronald Andrew, Esq., Defendants' Expert on Cayman Islands Law ("Andrew Aff."), at section 7.2. The Court may properly consider the Partnership Agreement because it was furnished to plaintiff in 1994 in connection with plaintiff's investment in the Funds. *See* LTC V Subscription, Ex. 1 to Chang Decl., at 1 (stating that plaintiff was furnished with "and has carefully read ... the Amended and Restated Limited Partnership Agreement of the Portfolio Company").

11. More precisely, pursuant to the master fund/feeder fund structure described in the Complaint, *see* Complaint ¶¶ 34, 37, and the mandatory redemption provisions set forth in relevant organizational documents, *see* Offering Memorandum, Ex. A to Hersch Decl., at 9; Partnership Agreement, Ex. 3 to Andrew Aff., at section 7.2, LTC Portfolio redeemed

mandatory redemption, Lakonia received $55,571,546—the full amount of its original investment plus approximately $5.5 million. RICO Stmt. at 77. Following the mandatory redemption, Lakonia retained a substantial investment in LTC V. *Id.* On July 31, 1998, the value of Lakonia's remaining investment was $72,768,929. *Id.*

### C. Impact of Russian Financial Crisis

On August 17, 1998, Russia devalued the ruble and declared a debt moratorium. Complaint ¶ 51. Russia's actions precipitated an international financial crisis. *Id.* ¶¶ 51, 52.

Among other things, the Russian debt moratorium sparked a "flight to quality" by investors; that is, investors sought safe, high-quality investments and avoided risk. *Id.* ¶ 52. The Complaint alleges that this flight to quality caused.

> credit risk spreads and liquidity premiums [to rise] sharply in markets around the world. The size, persistence, and pervasiveness of the widening of risk spreads represented an extreme deviation from the risk management models employed by the [LTC Funds], which were based on assumptions that did not take into account such dramatic circumstances but rather were historical in nature. As a result, the [LTC Funds] (and other market participants) suffered losses in individual markets that greatly exceeded what conventional (so called value at risk) models, estimated during more stable periods, suggested were probable.

*Id.* The flight to quality "also resulted in a substantial reduction in the liquidity of many markets, which made it difficult for the [LTC Funds] to reduce exposure quickly without incurring further ('fire sale') losses—particularly given the large positions it held in certain markets." *Id.* At the same time, the Funds were finding it difficult to raise capital or to obtain additional financing. *Id.* ¶ 54. By the end of August 1998, LTC Portfolio's available capital was $2.3 billion compared to $4.7 billion in December 1997—a loss of equity totaling more than fifty percent. *Id.* ¶ 53.

In early September 1998, the Bank Defendants modified their previously favorable credit arrangements with the Funds. *Id.* ¶ 57. For example, the Complaint charges that "certain Bank Defendants required [LTC Portfolio] to collateralize not only current but future risk." *Id.* Other Bank Defendants, in their role as counterparties to LTC Portfolio in derivative contracts, sought "as much collateral as possible from the [F]unds through the daily margining process, refusing previously extended intra day credits and in many cases seeking to apply possible liquidation values to market-to-market valuations." *Id.* In plain language, the Bank Defendants effectively raised the margin percentage requirements imposed on the Funds, further straining the Funds' available cash flow. *Id.* ¶¶ 57–58.

### D. Recapitalizing the Funds

Faced with the possibility that they would be unable to meet margin and collateral payments due at the end of September, the Funds employed defendant Goldman Sachs to find investors willing to infuse the failing venture with additional capital. *Id.* ¶ 58. On September 18, 1998, after trying unsuccessfully to raise additional capital for the Funds, Goldman Sachs telephoned William J. McDonough, President of the Federal Reserve Bank of New York (the "Federal Reserve"). *Id.* ¶ 60. Goldman Sachs informed McDonough that the Funds were "in dire straits, such that they might not be able to continue operations the following week." *Id.* Two days later, representatives from the Federal Reserve and the Treasury traveled to the Connecticut offices of LTC Management to review the Funds' books

---

an aggregate $2.5 billion worth of shares to the original feeder funds, including LTC V. The original feeder funds in turn redeemed an aggregate $2.5 billion worth of shares to their investors.

and records. *Id.* According to the Complaint, the government representatives were "shocked by the volume in off-balance sheet trading activity" which "far exceeded the on-balance sheet assets of the [F]unds and massively exceeded the [F]unds remaining capital." *Id.*

By September 21, the Funds' liquidity situation had deteriorated further. *Id.* ¶ 61. That evening, defendants Goldman Sachs, J.P. Morgan and Merrill Lynch met with Peter Fisher of the Federal Reserve to discuss various options for salvaging the Funds. *Id.* ¶ 62. The meeting continued the following day with the added participation of President McDonough and defendant UBS AG. *Id.* ¶ 63.

The group of commercial banks and government representatives focused primarily on a salvage option called the "consortium approach." *Id.* ¶ 64. Under the consortium approach, a group of the Funds' major creditors—namely, the thirteen Bank Defendants—would recapitalize LTC Portfolio by investing $3.6 billion in a newly created feeder fund and a newly created limited liability company (collectively, the "New Funds"). *Id.* ¶¶ 64, 70. The New Funds would then invest their combined $3.6 billion in LTC Portfolio in exchange for (i) a 90% interest in the assets of LTC Portfolio; and (ii) operational control of LTC Management. *Id.* ¶¶ 64, 70. The original investors in LTC Portfolio [12] would retain an aggregate 10% interest in the master fund. *Id.* ¶¶ 64, 70.

On September 23, Warren Buffet, American International Group and Goldman Sachs contacted McDonough and made a joint offer to purchase 100% of the Funds for $250 million in cash (the "Buffet Offer"). *Id.* ¶ 66. Pursuant to the Buffet Offer, the original investors in LTC Portfolio would no longer have any equity interest in the master fund. *Id.* Instead, the original investors, and in turn their share-

holders, would receive an aggregate cash-out payment of $250 million. *Id.* Meanwhile, the Funds' new owners—Buffet, American International Group and Goldman Sachs—would infuse LTC Portfolio with $4 billion and then "gradually liquidate at what Buffet thought could be a decent profit." *Id.* Buffet requested that the Funds respond to his Offer within 1.5 hours. *Id.*

McDonough contacted Meriwether via telephone and informed him of the Buffet Offer. *Id.* ¶ 67.[13] Meriwether told McDonough that the Buffet Offer was not feasible because Meriwether did not have authority to sell 100% of the Funds. *Id.* However, Meriwether did not obtain an independent legal opinion regarding his ability to sell 100% of the Funds. *Id.* Nor did Meriwether (i) attempt to negotiate the terms of the Buffet Offer; (ii) contact the other Principals to discuss the Buffet Offer; or (iii) conduct due diligence for purposes of comparing the Buffet Offer with the consortium approach. *Id.*

One day later, on September 24, the Bank Defendants formalized their consortium offer and collectively invested $3.6 billion in the New Funds as described above. *Id.* ¶¶ 68, 70. The New Funds in turn invested $3.6 billion in LTC Portfolio in exchange for a 90% equity stake in LTC Portfolio and operational control of LTC Management. *Id.* ¶¶ 64, 70. The remaining 10% equity stake was held by the original investors in LTC Portfolio, including LTC V. *Id.* ¶ 64.

## E. Recovery of the Funds and Redemption of Investors

Following the Bank Defendants' recapitalization, the financial health of the Funds greatly improved. *Id.* ¶ 78. By February 26, 1999, LTC Portfolio had earned returns of more than 20%. *Id.* By March 30,

---

12. The "original investors in LTC Portfolio" includes the original feeder funds and any other entities that invested directly in the master fund.

13. Meriwether did not participate in the meetings between the Bank Defendants and government officials. Complaint ¶ 67.

1999, the Funds' risk dropped by more than 50%, and the value of LTC Portfolio's assets increased to $5 billion. *Id.* The Bank Defendants announced that, as a result of the reduction in risk and an increase in the value of LTC Portfolio's net assets, they anticipated returning some capital to investors during the second half of 1999. *Id.*

In a letter dated June 17, 1999, Meriwether notified plaintiff and "the original 1994 investors" [14] that their shares would be mandatorily redeemed "in the near future." *Id.* ¶ 80. On July 6, 1999, the "Funds eliminated the interests of all of its outside investors,[15] including the plaintiff, by redeeming their interests with a $300 million redemption payment." *Id.* ¶ 81.[16] Pursuant to the redemption, Lakonia received $8,157,379. RICO Stmt. at 77.[17] Thus, Lakonia ultimately recouped $63,-728,925—a 27% return on its original investment of $50,039,887. *Id.* Also on July 6, the Funds made a $1 billion payment to the Bank Defendants. Complaint ¶ 81. The payment represented a return of 27.5% of the Bank Defendants' $3.6 billion investment in the Funds. *Id.*

On July 13, exactly one week after the redemption, plaintiff filed its initial complaint. Plaintiff filed its Amended Complaint on November 3, 1999.

## F. Allegations of the Complaint

The gravamen of the Complaint is that, under the guise of salvaging the distressed Funds, the Bank Defendants conspired with each other and with Meriwether to gain control of the Funds and to eliminate plaintiff and other shareholders for a fraction of the value they would have otherwise received. The Complaint sets forth four claims for relief.

Claim I charges the Bank Defendants with racketeering activity—mail and wire fraud—in violation of § 1962(b) of RICO, 18 U.S.C. § 1962(b). Specifically, Claim I alleges that the Bank Defendants purposefully exacerbated the effects of the Russian financial crisis by "dramatically revers[ing]" their previously favorable credit arrangements with the Funds and by "encouraging fear and concern in the market about the possibility that [the Funds] were in danger of abruptly collapsing in the very near-term." Complaint ¶¶ 57, 59. According to plaintiff, as a result of this alleged scheme, the Bank Defendants were able to buy out the Funds at a depressed price and to then profit handsomely once the artificial crisis was eliminated. *Id.* ¶¶ 72(d), 82, 94.

Under a similar theory, Claim II charges that the Bank Defendants conspired with Meriwether to engage in racketeering activity in violation of § 1962(d) of RICO, 18 U.S.C. § 1962(d).

Claim III alleges that Meriwether and the Fund Defendants breached their fiduciary duties to plaintiff by, among other things, improperly accepting the Bank De-

---

**14.** Although it is unclear, I assume plaintiff refers to the original feeder funds and the investors in those feeder funds.

**15.** Again, plaintiff's terminology is somewhat confusing. Presumably, the term "outside investors" includes the original feeder funds and, in turn, their shareholders.

**16.** To be precise, pursuant to the master fund/feeder fund structure described in the Complaint and the mandatory redemption provisions set forth in relevant documents, LTC Portfolio redeemed the investments of the original feeder funds, including LTC V, and then the original feeder funds subsequently redeemed the investments of their

shareholders, including Lakonia. *See* Complaint ¶¶ 34, 37, 81; Offering Memorandum, Ex. A to Hersch Decl., at 9; Partnership Agreement, Ex. 3 to Andrew Aff., at section 7.2; *see also supra* note 11.

**17.** By way of comparison, Lakonia's investment had a value of $72,768,929 on July 31, 1998. RICO Stmt. at 77. By October 31, 1998—one month after the Bank Defendants' recapitalization—the value of Lakonia's investment had dropped to $6,693,747. *Id.* Presumably, the value of Lakonia's investment was even lower in August and September 1998. However, plaintiff does not provide that figure.

fendants' consortium offer without procuring an independent fairness opinion or seriously considering the Buffet Offer. Complaint ¶¶ 69, 76. Claim IV charges the Bank Defendants with aiding, abetting and inducing Meriwether to breach his fiduciary duties to plaintiff. *Id.* ¶¶ 114–17.

Pursuant to these claims, plaintiff seeks treble damages, attorneys' fees and costs. *Id.* at 34.

### III. Discussion

Despite the complexity of the events and financial transactions underlying this litigation, resolution of the pending motions is relatively straightforward. Defendants attack the sufficiency of plaintiff's Complaint on numerous grounds, two of which—lack of standing under RICO and failure to adequately allege fraud for purposes of RICO—are dispositive.[18]

### A. Claims I & II: RICO

RICO creates a civil cause of action for "[a]ny person injured in his [or her] business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). As set forth above, plaintiff alleges violations of § 1962(b) and § 1962(d). Section 1962(b) provides:

It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(b). "Racketeering activity" includes, among other things, mail fraud and wire fraud. *See* 18 U.S.C. § 1961(1) (setting forth an exhaustive list

of racketeering activities). To plead a "pattern of racketeering activity", plaintiff must establish that each defendant committed at least two acts of racketeering—or two "predicate acts"—within a ten-year period. *See* 18 U.S.C. § 1961(5).[19]

The second RICO provision at issue here, § 1962(d), makes it "unlawful for any person to conspire to violate" any of the substantive provisions of § 1962. *See* 18 U.S.C. § 1962(d). Plaintiff has charged the Bank Defendants and Meriwether with conspiring to violate § 1962(b).

Before turning to a discussion of the sufficiency of plaintiff's claims under §§ 1962(b) and (d), I first address the threshold issue of whether plaintiff has standing to assert those claims.

### 1. RICO Standing

■ It is a well-settled principle of corporate law that "[a]n action to redress injuries to a corporation cannot be maintained by a shareholder in his [or her] own name but must be brought in the name of the corporation through a derivative action." *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1101 (2d Cir.1988) (internal quotations omitted). This principle applies with equal force to civil RICO claims. *See id.; see also Manson v. Stacescu*, 11 F.3d 1127, 1131 (2d Cir.1993) ("A shareholder generally does not have standing to bring an individual action under RICO to redress injuries to the corporation in which he owns stock.").

■ In the context of RICO, the direct/derivative dichotomy is often characterized as an issue of proximate cause. As set forth above, § 1964(c) provides a cause of action under RICO for any person "injured in his [or her] business or property

---

**18.** Absent a viable federal claim, this Court declines to exercise supplemental jurisdiction over plaintiff's state law claims, and therefore it is unnecessary to address the merits of those claims. *See infra* Part III.B.

**19.** The statute defines "enterprise" as "any individual, partnership, corporation, associa-

tion, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Plaintiff alleges that the LTC Funds constitute an "enterprise" for purposes of RICO. Complaint ¶ 103.

by reason of a violation of section 1962." *See* 18 U.S.C. § 1964(c). This language limits standing "to plaintiffs whose injuries were caused proximately by the RICO predicate acts." *Manson*, 11 F.3d at 1130 (citing *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992)). "A central element of proximate cause is a showing of some direct relation between the injury asserted and the injurious conduct alleged." *Id.* (internal quotations omitted). Where the shareholder's injury "is derivative of injury to the corporation, the shareholder's injury is not related directly to the defendant's injurious conduct." *Id.* at 1131; *see also Department of Econ. Dev. v. Arthur Andersen & Co.*, 924 F.Supp. 449, 464 (S.D.N.Y.1996). Thus, plaintiff may only assert claims under RICO if the injury it alleges is direct and not merely derivative of injury suffered by LTC V.[20]

### a. Derivative versus Direct Injury

█ An action is derivative "if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance or distribution among individual holders." *Nordberg v. Lord, Day & Lord*, 107 F.R.D. 692, 697 (S.D.N.Y.1985) (internal quota-

tions omitted). A decrease in value of a holder's shares which "merely reflects the decrease in value of the firm as a result of the alleged illegal conduct" is derivation rather than direct in nature and cannot confer individual standing under RICO. *See Rand v. Anaconda–Ericsson, Inc.*, 794 F.2d 843, 849 (2d Cir.1986) (quoting *Warren v. Manufacturers Nat'l Bank of Detroit*, 759 F.2d 542, 544 (6th Cir.1985) for proposition that, in RICO context, " '[d]iminution [sic] in value of the corporate assets is insufficient direct harm to give the shareholder standing to sue in [its] own right.' ").

█ Similarly, a shareholder cannot assert individual standing under RICO where all the shareholders of a corporation have experienced the same injury. *See Manson*, 11 F.3d at 1131–32. Unless the injury sustained by a shareholder "is separate and distinct from that sustained by other shareholders", the claim asserted is derivative and must be brought by or on behalf of the corporation. *Id.* at 1131; *see also, Nordberg*, 107 F.R.D. at 698 (" 'It is only where the injury sustained to one's stock is peculiar to him alone, and does not fall alike upon other stockholders, that one can recover as an individual.' ").[21]

20. Plaintiff may not pursue a derivative RICO action for two reasons. *First*, to assert a derivative claim, one must be a current shareholder of the injured corporation. *See North S. Fin. Corp. v. Al–Turli*, 93 Civ. 2133, 1996 WL 50526, *8 (S.D.N.Y.) ("[P]laintiffs cannot sue derivatively on behalf of a corporation in which they are no longer shareholders."), *aff'd*, 100 F.3d 1046 (2d Cir.1996). It is undisputed that at the time Lakonia filed this action it was no longer a shareholder of LTC V. *Second*, plaintiff has not complied with Federal Rule of Civil Procedure 23.1 which requires, among other things, that a shareholder asserting a derivative claim set forth in its complaint "the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed.R.Civ.P. 23.1.

There is no unfairness in this result. The purportedly objectionable recapitalization oc-

curred on September 23, 1998, while the mandatory redemption did not take place until July 6, 1999. *See supra* Parts II.D–E. Thus, plaintiff had nine months within which to demand—and if necessary to pursue—a derivative action on behalf of LTC V. Similarly, as plaintiff concedes in its Complaint, Meriwether informed shareholders on June 17, 1999, that their shares would be redeemed "in the near future." Complaint § 80. With this notice, plaintiff had almost three weeks within which to demand action from the board of LTC V and/or to file a complaint in state or federal court.

21. The Second Circuit has recognized a "special duty exception" to the general rule that shareholders do not have individual standing under RICO to redress injuries to the corporations in which they own stock. *See Manson*, 11 F.3d at 1131 (recognizing limited "special duty exception" where "the shareholder sustains an injury that is separate and distinct from the injury sustained by the cor-

### b. Nature of Plaintiff's Alleged Injury

■ Plaintiff contends that it has pleaded direct injury by

alleging that (a) defendants wrongfully stripped away 90% of the equity interests of the outside shareholders for grossly insufficient consideration; and (b) those shareholders who were Principals (including defendant Meriwether) received better treatment than the outside shareholders because the outside investors were redeemed against their will at an inadequate price, while the Principals and Bank Defendants retained their existing interest and the potential upside involved.

Pl.Opp. at 13; *see also* Complaint ¶¶ 5, 55, 72(d), 82, 97, 105. Neither of these allegations is sufficient to demonstrate direct harm to plaintiff. Rather, the injury plaintiff alleges is wholly derivative of injury purportedly suffered by LTC V.

*First,* it is undisputed that LTC V—not Lakonia— owned equity in LTC Portfolio. *See* Complaint ¶¶ 34, 37–38; Offering Memorandum, Ex. A to Hersch Decl.; LTC V Subscription, Ex. 1 to Chang Aff.[22] Thus, when the Bank Defendants invested $3.6 billion in LTC Portfolio, they "stripped away" or diluted 90% of the equity interests shared by LTC V and the other original investors in LTC Portfolio. The Bank Defendants' recapitalization of LTC Portfolio could not have "stripped away" plaintiff's equity interests, because plaintiff had no equity interests in the master fund. Accordingly, any harm suffered by Lakonia as a result of the recapitalization is necessarily indirect; such harm "merely reflects the decrease in value of [LTC V] as a result of the alleged illegal conduct", namely the Bank Defendants' dilution of LTC V's equity interest in the master fund. *See Rand,* 794 F.2d at 849; *see also Nordberg,* 107 F.R.D. at 698.

*Second,* plaintiff's claim that the Principals and Meriwether were treated differently than "outside investors who were redeemed against their will" is meaningless. The Complaint is devoid of any allegation that Meriwether or the Principals owned shares of LTC V. Similarly, there is no allegation that plaintiff was treated differently than any other shareholder of LTC V. Thus, because plaintiff suffered the same injury as all other shareholders of LTC V, it cannot assert individual standing under RICO.[23] *See Manson,* 11

poration"). The exception has been successfully invoked where the shareholder alleges that it was "fraudulently induced to become a shareholder in the first place." *Department of Econ. Dev.,* 924 F.Supp. at 464 (collecting cases in which individual RICO standing was premised upon claims of fraudulent inducement). In those cases, the injury alleged was not merely derivative of the injury suffered by the corporation. Rather, the plaintiffs suffered a separate and distinct injury in their capacity as purchasers of securities. *See, e.g., Ceribelli v. Elghanayan,* 990 F.2d 62, 63–64 (2d Cir.1993) (finding individual RICO standing where defendant allegedly breached his independent duty as "seller of stock" to securities purchasers); *see also Manson,* 11 F.3d at 1131 (distinguishing between fraudulent activity prior to the purchase of securities and fraudulent activity subsequent to the purchase of securities, and indicating that the special duty exception applies only to plaintiffs alleging the former).

In the instant case, plaintiff does not allege that it was fraudulently induced to purchase shares of LTC V. Nor does it identify an injury that is separate and distinct from the injury suffered by LTC V. *See infra* Part III.A.1.b. Accordingly, the special duty exception is inapplicable.

**22.** Plaintiff's repeated use of ambiguous terms such as "outside shareholders" is confusing and, I suspect, largely disingenuous. Similarly disingenuous is plaintiff's refusal to acknowledge the different roles of the original feeder funds and their shareholders. By lumping them together in a single group— "outside shareholders"—plaintiff ignores the clear corporate structure of the Funds.

**23.** To the extent plaintiff complains that its shares were redeemed for insufficient consideration, that claim is also one of derivative harm resulting from the Bank Defendants' alleged artificial depression of the net asset value of LTC Portfolio combined with their dilution of the equity interests of the original investors in LTC Portfolio. *See* Complaint ¶¶ 7, 72(d), 97; RICO Stmt. at 77.

That the redemption occurred in two steps is also relevant. As described *supra* Part II.

F.3d at 1131–32.[24]

### 2. Failure to Allege Predicate Acts of Fraud

■ Assuming arguendo that plaintiff has standing to pursue its RICO claims, those claims suffer from an even more fundamental flaw: plaintiff fails to allege fraud under any standard, let alone the heightened pleading requirements of Rule 9(b).

### a. Mail and Wire Fraud

■ Plaintiff's substantive RICO claim under § 1962(b) is premised upon the predicate acts of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343. A plaintiff alleging mail and wire fraud must show "(1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." *S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir.1996).

The first element, a scheme to defraud, "requires fraudulent or deceptive means, such as material misrepresentation or concealment." *A. Terzi Prods., Inc. v. Theat-*

*rical Protective Union*, 2 F.Supp.2d 485, 499 (S.D.N.Y.1998) (internal quotations omitted). As the Second Circuit recently stated in *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 170 (2d Cir.1999), "For RICO liability to exist as a result of a violation of [the mail and wire fraud] statutes, the defendant must have made misrepresentations that are material to the harm caused to the victim." Thus, to survive dismissal of its § 1962(b) claim, plaintiff must allege that the Bank Defendants[25] made material misrepresentations, concealed material information or otherwise engaged in deceptive or dishonest practices.[26]

In addition, as set forth *supra* Part I, plaintiff's allegations of fraud must comply with the heightened pleading requirements of Rule 9(b). *Id.* at 173; *S.Q.K.F.C.*, 84 F.3d at 634. "In the RICO context, Rule 9(b) calls for the complaint to 'specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.'" *Moore*, 189 F.3d at 173 (quoting *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992)).[27]

E., LTC Portfolio—at the direction of the Bank Defendants and Meriwether—redeemed LTC V and the original feeder funds for an aggregate payment of $300 million. The original feeder funds in turn redeemed their shareholders for an aggregate payment of $300 million. Thus, plaintiff's alleged receipt of insufficient consideration for its shares resulted from LTC V's alleged receipt of insufficient consideration for its shares. Again, plaintiff's claimed harm is derivative of that purportedly suffered by LTC V.

**24.** My conclusion that plaintiff's RICO claims are derivative does not necessarily mean that *plaintiff's state law claims are derivative*. However, for the reasons stated *infra* Part III.B., I do not address whether plaintiff has standing to pursue its state law claims in an individual capacity.

**25.** Plaintiff's § 1962(b) claim is brought only against the Bank Defendants. *See supra* Parts II.E., III.A.

**26.** Note that "a defendant's mailings or [wire transmissions] need not themselves contain false information, so long as they further ran underlying scheme which itself has a fraudulent, deceptive purpose." *A. Terzi Prods.*, 2 F.Supp.2d at 501 n. 12 (citing *Schmuck v. United States*, 489 U.S. 705, 714–15, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989)). Thus, where plaintiff establishes the first element—existence of a scheme to defraud—mailings or wire transmissions that are themselves innocuous may suffice to establish the third element—mailings and wire transmissions in furtherance of that scheme. *Id.*

**27.** Rule 9(b) also mandates that plaintiff "allege facts that give rise to a strong inference of fraudulent intent" and "identify the purpose of the mailing[s] [or wire transmissions] within the defendant[s'] fraudulent scheme." *Moore* 189 F.3d at 173 (internal quotations omitted).

In the instant case, plaintiff makes numerous conclusory—and rather dramatic—accusations regarding the Bank Defendants' fraudulent scheme. However, not once in its 35–page Complaint or its 90–page RICO statement does plaintiff identify a misrepresentation, omission or any other deceptive act which would evidence such a scheme. This failure is fatal to plaintiff's substantive RICO claim.

### b. The Bank Defendants' Alleged Scheme

Plaintiff describes the Bank Defendants' scheme to defraud as follows:

> The [Bank] Defendants made deceptive statements to federal banking regulations which exaggerated the reported [Russian financial] crisis because the Banks did not reveal the extent to which [the Funds'] troubles were the result of unreasonable—indeed predatory—activities by the Bank Defendants with respect to collateral and margin requirements and other credit restrictions. Similarly, deceptive statements concerning the nature of the crisis and the need for the bailout were issued by Meriwether and the [Fund Defendants] to their shareholders and the investing public. As a result of those predatory and deceptive acts, the Bank Defendants were able to obtain control of [the Funds]. In the course of that activity, they first usurped 90% of plaintiff's equity interest in [the Funds] at a grossly deficient price, and subsequently took the rest.

Pl.Opp. at 17–18. Each of these charges is addressed in turn below.

**28.** I use the term "arguably" with great emphasis. Plaintiff itself describes the "shocking events in Russia" and the "extraordinary financial market conditions that emerged as a result of Russia's devaluation of the ruble and its declaration of a debt moratorium in August 1998." Complaint ¶¶ 3, 54. Plaintiff further concedes that "Russia's actions sparked a 'flight to quality'" which caused the Funds to suffer losses that "greatly exceeded" conventional estimates. *Id.* ¶ 52; *see*

### (1) Credit Restrictions

At the heart of the purported scheme is plaintiff's allegation that "the Bank Defendants acted to artificially increase and exacerbate the 'crisis' atmosphere ... by dramatically revers[ing] their customary credit arrangements with [the Funds]." Complaint ¶ 57. According to the Complaint, "[p]reviously flexible arrangements became rigid, and daily mark-to-market valuations for collateral calls became contentions, whereas in the past they had been cooperative." *Id.* Plaintiff sets forth several examples of the Bank Defendants' alleged credit modifications and contends that "[i]n very important respects, the new margins imposed represented extraordinary and arbitrary departures from normal credit standards in the industry." *Id.; see also supra* Part II.C. The Complaint does not allege, however, that the Bank Defendants' credit modifications violated corporate, banking or contract laws or were otherwise illegal in any way.

Despite plaintiff's arguments to the contrary, this Court is at a loss to understand how the Bank Defendants' tightening of their credit arrangements with the Funds—however · drastic—constitutes fraud. As set forth above, to survive dismissal plaintiff must identify and explain the conduct it claims was false and deceptive. *See Moore,* 189 F.3d at 173. Plaintiff cannot meet this requirement by asserting that the Bank Defendants "raised the margin percentage requirements imposed on [the Funds]". Complaint ¶ 57. Although such conduct was arguably unjustified, extraordinary and harmful to the Funds, it was not in and of itself false or misleading.[28] *Cf. A. Terzi Prods.,* 2

*also supra* Part II.C. Finally, plaintiff explains that "[a]s the [F]unds' 'bets' continued to run into trouble, losses mounted, and it was increasingly difficult to decrease, or 'unwind,' positions because of the sheer size of some of [the Funds'] positions." Complaint ¶ 54.

In this admittedly 'extraordinary' context, plaintiff's assertion that the Bank Defendants' conduct was "extraordinary" is meaningless. In fact, it is difficult to imagine that any creditor faced with such a financially dis-

F.Supp.2d at 500 (dismissing civil RICO claim for failure to plead a scheme to defraud because although defendants' threats and abusive conduct "may have been wrongful, even reprehensible . . . they were not deceptive").

### (2) Deceptive Statements

Plaintiff's claims regarding step two of the fraudulent scheme—namely, that the Bank Defendants made "deceptive statements" regarding the extent of the crisis to federal regulators, the Funds' shareholders and the investing public—are similarly unavailing.

*First,* the Complaint's sole allegation regarding deceptive statements made by the Bank Defendants to federal regulators is that

[i]n a series of communications with the Federal Reserve Bank . . . and others, the Bank Defendants misrepresented the extent and true nature of the crisis by omitting to disclose that they had exceeded the bounds of recognized and appropriate margin and collateral requirements in their recent dealings with [the Funds]. This deception strongly encouraged the belief that the only way to salvage the situation was for the Banks themselves—who were the principle [sic] counterparties and trading competitors of [the Funds], and therefore had enormous incentive to know and control the contents of [the Funds'] portfolios—to obtain ownership and control of [the Funds] in return for a capital infusion.

Complaint ¶ 4. This bare and conclusory assertion falls far short of the pleading requirements set forth in Rule 9(b). Among other things, plaintiff's general reference to a "series of communications" fails to adequately identify those communications, let alone "the time, place, speaker or substance" of those communications. *Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.,* 170 F.R.D. 361, 383 (S.D.N.Y.1997) (dismissing RICO claim where complaint did "not even remotely approach [Rule 9(b)'s] requirements for pleading mail and wire fraud as predicate acts"). Moreover, any allegation that the Bank Defendants concealed or misrepresented their credit modifications from the Federal Reserve is explicitly contradicted by plaintiff's admission that "three representatives of the Federal Reserve and one representative of the Treasury traveled to the Management Company's headquarters to review [the Funds'] books and records." Complaint ¶ 60.[29]

*Second,* and similarly, the Complaint sets forth only a single allegation regarding deceptive statements issued by the Bank Defendants to the Funds' shareholders and the investing public:[30] "[T]he Bank Defendants reinforced the crisis atmosphere by encouraging fear and concern in the market about the possibility that [the Funds] were in danger of abruptly collapsing in the very near-term, causing catastrophic reverberations on already extremely fragile world markets." Complaint ¶ 59. Again, plaintiff's vague accusation clearly violates Rule 9(b). Even

tressed debtor would not similarly tighten restrictions and modify credit arrangements. I suspect that the commercial banks would have been roundly criticized had they reacted otherwise.

**29.** I also find persuasive the Bank Defendants' additional argument that any allegation that "the Fed[eral Reserve was] unable to make its own independent assessment of the severity of the pending global financial crisis and its potential impact on the Master Fund and the U.S. economy" is "far-fetched." *See* Reply Memorandum of Law in Further Support of the Bank Defendants' Motion to Dismiss the First Amended Complaint ("Banks' Reply") at 7 n. 5. Indeed, any purported scheme to defraud in which the perpetrators voluntarily contact federal regulators and invite them to supervise the allegedly fraudulent activities, *see* Complaint ¶¶ 60–68, is far-fetched.

**30.** Despite the plaintiff's contrary representation in its brief, *see* Pl.Opp. at 17; *supra* Part III.A.2.b., the Complaint makes no allegations regarding "deceptive" statements issued by Meriwether and the Fund Defendants to "shareholders and the investing public".

assuming the Bank Defendants "encouraged fear and concern in the market" through fraudulent and dishonest communications, the Complaint does not provide any information regarding the identity, substance or source of the communications.[31]

*Third,* as a matter of logic, the idea that the Bank Defendants would attempt to deceive federal regulators, the Funds' shareholders or the public makes no sense in the context of plaintiff's charged scheme. Although the Federal Reserve supervised and participated in meetings regarding the rescue or "bail-out" of the Funds, there is absolutely no allegation that the Federal Reserve had any power to accept or approve the terms of the Bank Defendants' recapitalization. To the contrary, the Complaint makes clear that Meriwether and the Fund Defendants—not the Federal Reserve—"agreed to the consortium's takeover." Complaint ¶ 69.

Plaintiff's reference to deception of the Funds' shareholders and the public is even more opaque. The fraudulent scheme, as alleged by plaintiff, was not directed at the shareholders and was not intended to elicit any action or forbearance on their part. For example, this is not a case in which

defendants are accused of fraudulently inducing investors to buy securities, sell securities or approve a tender offer. *Cf. Moore,* 189 F.3d at 167 (defendant allegedly "disguised a life insurance policy as an investment package similar to an [IRA], thereby tricking [plaintiffs] into buying life insurance with funds they would otherwise have used for IRAs or similar investments"). Because plaintiff was not the target of the Bank Defendants' alleged scheme—it did not sell its shares or buy additional shares, nor did it approve the consortium offer—it is irrelevant that the Bank Defendants, the Fund Defendants or Meriwether allegedly attempted to deceive plaintiff and other shareholders in the Funds.[32]

Similarly, although plaintiff accuses the Bank Defendants of "encouraging fear and concern in the market", there is no market for the Funds' shares and those shares are not publicly traded. *See* Offering Memorandum, Ex. A to Hersch Decl., at (i); *supra* Part II.A.3. Thus, the Bank Defendants had no reason to defraud either the market or the investing public, and even assuming they did so, such deception is irrelevant to the events challenged here.

---

**31.** With respect to its failure to comply with Rule 9(b), plaintiff cites *In re Sumitomo Copper Litigation,* 995 F.Supp. 451 (S.D.N.Y. 1998), for the proposition that

> [i]n cases in which the mails or wires were simply used in furtherance of a master plan to defraud, . . . a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications[ ] is sufficient to satisfy Rule 9(b).

Pl.Opp. at 21 (quoting *In re Sumitomo,* 995 F.Supp. at 456). Plaintiff's reliance on *Sumitomo* is misplaced for two reasons, *First,* as explained *supra* Parts III.A.2.b.(1)–(2) and *infra* Part III.A.2.b.(3), plaintiff fails to provide any description of a fraudulent scheme let alone the "detailed description" required by Rule 9(b) and *Sumitomo.* Thus, even if defendants' communications were simply "in furtherance of a master plan", plaintiff's allegations of fraud would still violate Rule 9(b).

*Second,* and more important, plaintiff in fact alleges that defendants' communications—namely, those discussed above—were

fraudulent. For example, the Complaint asserts that "[i]n a series of communications with the Federal Reserve Bank . . . the Bank Defendants *misrepresented. . . . "* Complaint ¶ 4 (emphasis added). Similarly, in describing the fraudulent scheme, plaintiff states: "The Bank Defendants made *deceptive statements* to federal banking regulators. . . . Similarly, *deceptive statements* concerning the nature of the crisis . . . were issued by Meriwether and the [Fund Defendants]." Pl.Opp. at 17 (emphasis added). To borrow the language of *Sumitomo,* "In cases in which a plaintiff claims that specific statements or mailings were themselves fraudulent . . . the complaint should specify the fraud involved, identify the parties responsible for the fraud, and where and when the fraud occurred." 995 F.Supp. at 456.

**32.** Of course, the fact that the charged scheme did not directly involve plaintiff in any way highlights the causation issues discussed previously in the context of RICO standing. *See supra* Part III.A.1.

### (3) Recapitalization and Redemption

Finally, I turn to plaintiff's claim that defendants "usurped 90% of plaintiff's equity interest in [the Funds] at a grossly deficient price, and subsequently took the rest." Pl.Opp. at 18. No matter how inflammatory the language plaintiff chooses to use, it cannot transform what is, in essence, a challenge to the substantive fairness of the Bank Defendants' recapitalization. The Bank Defendants did not "usurp", steal or swindle 90% of LTC Portfolio's equity interests. Rather, it paid for those interests with $3.6 billion of much-needed capital. Absent even the hint of any other dishonest or deceitful conduct, the mere fact that plaintiff believes the Bank Defendants should have paid more cannot and does not constitute fraud.[33]

Plaintiff's statement that the Bank Defendants "took" the remaining 10% is equally baseless in light of provisions in both the Partnership Agreement and Offering · Memorandum authorizing the Funds to redeem the interests of their investors at any time and for any reason.

---

**33.** I further note that plaintiff's challenge to the substantive fairness of the Bank Defendants' recapitalization is seriously undermined by its championing of the Buffet Offer. *See* Complaint ¶¶ 5, 66–68, 75–77. The Court does not possess full information regarding both offers. However, as described by plaintiff, the Bank Defendants' consortium offer appears to be superior in value. According to the Complaint, "[b]y late September, [LTC Portfolio's] capital had shrunk to approximately $400 million." *Id.* ¶ 70. At that time, Buffet offered to purchase 100% of the equity of LTC Portfolio for $250 million in cash. *Id.* In contrast, the Bank Defendants infused LTC Portfolio with $3.6 billion in exchange for 90% of the equity of the master fund—bringing the total value of LTC Portfolio to approximately $4 billion. *Id.* Comparing the total values of each offer, it is difficult to see how the Banks Defendants' $3.6 billion for 90% of LTC Portfolio is "grossly deficient" when compared with Buffet's $250 million for 100% of LTC Portfolio.

With respect to how both offers impacted Lakonia, the Bank Defendants again come out ahead. Pursuant to the Buffet Offer, in September 1998, Lakonia would have shared

*See* Offering Memorandum, Ex. A to Hersch Decl., at 9; Partnership Agreement, Ex. 3 Andrew Aff., at section 7.2.; *see also Schnell v. Conseco, Inc.,* 43 F.Supp.2d 438, 445 (S.D.N.Y.1999) (dismissing RICO action for failure to allege a fraudulent scheme because "[h]owever aggressive or self-interested the bargains [defendant] struck for itself might have been, the fact remains that there is 'nothing deceptive . . . about the exercise of an express contractual right' ").[34]

\*　　\*　　\*　　\*　　\*　　\*

█ Because plaintiff has failed to adequately allege material misrepresentations, omissions or any other deceitful conduct, its § 1962(b) claim is dismissed pursuant to Rules 12(b)(6) and 9(b). In addition, "[w]here a RICO conspiracy claim is based upon predicate acts that have been dismissed by the court, the conspiracy claim must be dismissed as well." *Odyssey Re (London) Limited v. Stirling Cooke Brown Holdings,* 85 F.Supp.2d 282, 303 (S.D.N.Y. 2000) (internal quotations omitted); *see also Brooke v. Schlesinger,* 898 F.Supp.

$250 million with every other original investor in the master and feeder funds. *Id.* ¶¶ 66, 70. Pursuant to the Bank Defendants' offer, in July 1999, Lakonia shared $300 million with the original feeder funds and their shareholders. *Id.* ¶ 81. (Plaintiff alleges that Meriwether and the other Principals "retained their existing interest" following the July 1999 redemption, and therefore they would not have shared in the $300 million. *See* Pl.Opp. at 13; *supra* III.A.1.b.) Even discounting for present value, the consideration offered by Buffet would have been inferior to what plaintiff ultimately received from the Bank Defendants.

**34.** The Complaint makes passing references to "fundamental conflicts of interest" between the Funds and the Bank Defendants stemming from "the fact that [the Funds] compete with the Bank Defendants in debt, equity, currency and other financial markets . . . and/or are on the opposite side of numerous transactions with the Bank Defendants." Complaint ¶ 49. However, the Complaint fails to allege that this purported conflict was fraudulently concealed from the Funds, the Funds' investors, federal regulators or the public.

1076, 1085 (S.D.N.Y.1995). Accordingly, plaintiff's § 1962(d) claim is similarly dismissed.[35]

### B. Claims III & IV: Breach of Fiduciary Duty

Pursuant to 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over state law claims where "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Because all of plaintiff's federal claims are dismissed, I decline to exercise supplemental jurisdiction over plaintiff's state law claims for breach of fiduciary duty and therefore dismiss those claims as well. *See Martinez v. Simonetti*, 202 F.3d 625, 636 (2d Cir.2000) (directing dismissal of supplemental state law claims where no federal claims remained).[36]

### IV. Leave to Amend

 Under Federal Rule of Civil Procedure 15(a), "leave to amend shall be freely granted when justice so requires." Fed.R.Civ.P. 15(a). However, the decision whether the grant leave to amend rests within the sound discretion of the district court. *See Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir.1990). Courts may properly deny amendment where there is evidence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

 Applying these principles to the instant case, plaintiff's claims are dis-

missed with prejudice. *First*, plaintiff has already been given ample opportunity to amend its complaint. Plaintiff filed its original complaint on July 13, 1999. On September 23, 1999, defendants served plaintiff with motions to dismiss that complaint, and all the parties appeared before this Court. *See* 9/23/99 Hearing Transcript. Both in their briefs and during the conference, defendants argued, among other things, that plaintiff lacked standing to pursue its RICO claim and that the original complaint failed to plead the predicate acts of mail and wire fraud. At the end of the conference, I directed plaintiff to carefully review defendants' motion papers and to file an amended complaint if necessary and if it could do so in good faith. *See id.* at 15–17. On November 3, 1999, plaintiff filed the instant Amended Complaint without curing any of the defects pointed out by defendants and discussed during argument before this Court. In light of plaintiff's failure, it is not entitled to a third attempt, particularly because defendants have already twice expended a great deal of time and energy responding to plaintiff's claims. *See Denny v. Barber*, 576 F.2d 465, 471 (2d Cir.1978) (where plaintiff is on notice of deficiencies in complaint at time of first amendment, it is not entitled to a "third go-around"); *Coakley v. Jaffe*, 49 F.Supp.2d 615, 629 n. 14 (S.D.N.Y.1999) ("Because the general deficiencies in plaintiffs' pleadings were called to their attention at the time their original Complaint was dismissed without prejudice, their failure to cure most of these deficiencies in their Amended Complaint, coupled with the futility of granting them leave to replead … more than warrants dismissal with prejudice.").

*Second*, the defects in plaintiff's RICO claims are so substantial that any further

---

**35.** Defendants raise what appear to be several equally valid challenges to plaintiff's RICO claims including (i) failure to allege a "pattern" of racketeering activity; (ii) failure to allege loss causation; and (iii) failure to allege a RICO conspiracy. However, I do not reach these issues in light of plaintiff's clear lack of standing under the statute and its failure to

adequately allege the predicate acts of mail and wire fraud.

**36.** Because I decline to exercise supplemental jurisdiction over plaintiff's state law claims, it is unnecessary to reach the merits of those claims.

attempt to amend its pleadings would be futile. Put simply, almost one year after the challenged transaction, plaintiff has yet to come forth with the most basic allegations of fraud, let alone a jurisdictional basis upon which to assert that fraud. Moreover, both in its Complaint and its RICO Statement, plaintiff makes clear that absent discovery it possesses no further facts to plead in support of its mail and wire fraud claims. *See* Complaint ¶¶ 91–92; RICO Stmt. at 78–80. However, it is well-settled that " 'the purpose of discovery is to find out additional facts about a well-pleaded claim, not to find out whether such a claim exists.' " *Ross v. Mitsui Fudosan, Inc.*, 2 F.Supp.2d 522, 528 (S.D.N.Y.1998) (quoting *Jones v. Capital Cities/ABC Inc.*, 168 F.R.D. 477, 480 (S.D.N.Y.1996)); *See also Meyer v. Zubak*, 97 Civ. 1393, 2000 WL 145754, *3 (S.D.N.Y. Feb.8, 2000) ("[T]he purpose of discovery is not to enable [plaintiff] to determine whether he has a viable claim.").

## V. Conclusion

For the foregoing reasons, defendants' motions to dismiss are granted in their entirety. The Clerk of the Court is directed to close this case.